NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

F. McKenzie DAVISON, W. J. Hardy, Sr., and W. J. Hardy, Jr., d/b/a Arlington Asphalt Company, Respondent.

No. 8759.

United States Court of Appeals Fourth Circuit.

Argued Jan. 11, 1963.

Decided May 28, 1963.

Melvin J. Welles, Attorney, National Labor Relations Board (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mal-let-Prevost, Asst. General Counsel, and Lee M. Modjeska, Attorney, National Labor Relations Board, on brief), for petitioner.

William B. Devaney, Washington, D. C. (Charles G. Williamson, Jr., and Steptoe & Johnson, Washington, D. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

The National Labor Relations Board petitions for enforcement of its order of March 30, 1962, in which the employer-respondent [1] was found to have committed unfair labor practices in violation of section 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 158 (a) (5) and (1), by insisting to an impasse upon a voluntary, non-mandatory subject of collective bargaining.[2]

On May 16, 1960, District 50, United Mine Workers of America (henceforth District 50), was certified by the Labor Board as the collective bargaining agent for a unit composed of all truck drivers and laborers employed at the employer's plants in and around the County of Arlington, Virginia.[3] On May 28th, Arlington and District 50 held their first negotiating session. Various contract

---

1. F. McKenzie Davison, W. J. Hardy, Sr., and W. J. Hardy, Jr., d/b/a Arlington Asphalt Company (henceforth Arlington).

2. The Board's order is reported at 136 N.L.R.B. 742 (1962).

3. The certification contained the usual statutory exclusions and excluded as well machine operators and plant engineers who were covered by a contract between Arlington and Local 77, International Union of Operating Engineers (henceforth IUOE).

proposals were considered. There was discussion of possible retaliation or pressure by the Building and Construction Trades Unions (henceforth BCTU) against contractors, such as Arlington, whose employees were represented by District 50 which was not a BCTU.[4] The parties recognized that retaliation could assume one or more of three forms: (1) picketing at the job sites where such contractors were performing work; (2) requests or threats directed at general contractors subcontracting work to such contractors; or (3) refusal by general contractors to award work to employers whose employees were not represented by BCTU.

Both the Trial Examiner and the Board found that by August 31, 1960, substantial agreement had been reached on the terms of a collective bargaining contract. There was no resolution, however, of the potential problem of retaliation by the BCTU. It was further found that Arlington conditioned its acceptance of a collective bargaining agreement upon District 50's accepting an indemnity clause or some other provision against retaliation.[5] District 50, on the other hand, rejected the indemnity clause and the alternative solutions that were offered.

The next bargaining session was not held until April 11, 1961, and the final meeting was on April 21st.[6] At the April meetings Arlington proposed two alternative solutions to the potential problem of retaliation.[7] However, counsel for Arlington testified that in the course of these discussions he "stated quite frankly that the indemnity provision was not a particularly satisfactory one insofar as the company was concerned, but it was the only avenue of relief that we could

4. Arlington contends that to the extent the construction industry is organized, it is almost entirely represented by the BCTU which strenuously opposes any attempts to encroach upon what it considers its rightful jurisdiction.

5. The following indemnity clause was proposed:
    "1. The purpose of this clause is to prevent any and all losses, to the Party of the First Part (Respondent) [Arlington], directly or indirectly caused by, Secondary Boycotts, the loss of existing or future profits from any or all contracts the Party of the First Part may have at this time or may secure in the future, by being refused any or all work because of the Party of the First Part's Membership in District 50, and because of this membership not being permitted to work for General Contractors whose jobs are serviced by the AF of L or the Washington Bldg. Trades Council.
    "2. The party of the second part (Charging Party) [District 50] agrees to indemnify the Party of the First Part against the entire purport of Paragraph 1 above by the execution of a Surety Bond of not less than $10,000.00." 136 N.L.R.B. at 743, 753.

6. It is uncontradicted that, by mutual agreement, the parties suspended the negotiations pending prosecution of unfair labor practice charges by District 50

against another contractor and Local 77, IUOE. (The illness of Colonel Davison, a partner of Arlington, was an additional cause of delay.) By letter dated April 6, 1961, District 50 appealed to the General Counsel from a refusal by the Regional Director of the Labor Board to issue a complaint in these cases. The General Counsel affirmed the Regional Director's decision.
    Presumably these cases involved allegations that:
    " * * * [A] subcontractor, Corson and Gruman, was forced off a quarter-of-a-million dollar job on August 25, 1960, it had with prime contractor John F. Casey Company due to pressures brought against Casey by the Operating Engineers [a building and construction trades union] because Corson had a collective-bargaining agreement with District 50, U.M.W.A." 136 N.L.R.B. at 753.
    At the hearing below, Colonel Davison testified that subsequently "District 50 lost their representation of all the Washington contractors that formerly belonged to District 50." No finding of fact was made as to this contention.

7. It was found that among the alternate proposals made by Arlington were: "(1) an oral contract with written check-off authorizations, and (2) a contract applicable to non-AFL jobs only." 136 N.L.R.B. at 744 n. 3.

see." [8]  The Board found that just as the last session was concluding, District 50 indicated that it would advise Arlington "whether those solutions or others that might occur to them would be worth further discussions." 136 N.L.R.B. at 744. The unfair labor practice charges were then brought and the parties stipulated that:

> "The sole issue upon which the Union and Respondent were unable to agree * * * and which precluded and to date continues to preclude a final agreement between the Union and Respondent was a solution which would protect Respondent in the event of possible retaliation and/or pressure brought by the building and construction trades unions * * *. The Union refused to agree to any offers made by Respondent which related to the problem * * *. From on or about August 31, 1960 to date, Respondent has taken and has adhered to the position that any final agreement between the parties was contingent on acceptance by the Union of some form of solution to the problem * * *." 136 N.L.R.B. at 752.

On this record, the Board accepted the Trial Examiner's finding that Arlington had insisted, to the point of impasse, upon an indemnity provision. The Trial Examiner, however, concluded that the proposal was a mandatory subject of collective bargaining, i. e., it related to "wages, hours, and other terms and conditions of employment," section 8(d), 29 U.S.C.A. § 158(d), in that a curtailment of work caused by BCTU action would affect the employment of Arlington's employees. He therefore further concluded that there was no violation by the employer of section 8(a) (5) and (1) and

recommended dismissal of the complaint in its entirety. The Board concluded to the contrary that Arlington's indemnity proposal was not a "mandatory subject as to which it was entitled to bargain to an impasse." 136 N.L.R.B. at 747. Finding, as a result, that Arlington had engaged in unfair labor practices in violation of section 8(a) (5) and (1), the Board ordered Arlington to cease and desist therefrom and further ordered that:

> "Upon the request of District 50, [Arlington must] sign a contract containing all the provisions agreed upon with District 50 on August 31, 1960, excluding the indemnity provision insisted upon by the Respondent. If no such demand is made, upon request of the aforementioned labor organization, [Arlington must] bargain collectively with it as the exclusive representative of the employees in the appropriate unit and if an understanding is reached, embody such understanding in a signed agreement." 136 N.L.R.B. at 749.

■ In opposition to the Board's petition for enforcement, Arlington argues that both the Trial Examiner and the Board erred in finding that it had insisted to an impasse upon an indemnity provision and that the Board further erred in concluding that the indemnity provision was not a mandatory subject for bargaining. We think that when the record is considered as a whole there is ample support for the finding of fact that an impasse had been reached as a result of Arlington's insistence on an indemnity provision. Arlington continued to bargain and to insist on the indemnity proposal, at least until a better solution could be found, well after it had been rejected by District 50. See Universal

---

8. Apparently in the hope of minimizing the danger of discrimination by the BCTU, the parties agreed to include a clause in the contract permitting Arlington to adjust its wages to meet prevailing BCTU rates. Relating his discussions with District 50's counsel regarding the "wage adjustment proposal" and what he contended was District 50's offer of "a general provision that the union would take such legal action as would be available to it in the event of a strike or picketing by the building trades," Arlington's counsel testified that "the area we both recognized as being untouched by our legal remedy was the failure to award work by general contractors."

Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Katz, 369 U.S. 736, 741–742, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). We are also of the opinion that the Labor Board correctly concluded that the indemnity provision was a non-mandatory subject of bargaining. Arlington thus failed in its obligation to bargain in good faith, thereby committing unfair labor practices in violation of section 8 (a) (5) and (1) of the N.L.R.A. See N. L. R. B. v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

It is unnecessary to relate once again the legislative history of the provisions imposing the statutory obligation to bargain in good faith.[9] Section 8(a) (5) provides that "[i]t shall be an unfair labor practice for an employer—to refuse to bargain collectively with the representatives of his employees * * *." Section 8(d) provides that "to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to * * confer in good faith with respect to wages, hours, and other terms and conditions of employment."[10]

In the Borg-Warner case, the Supreme Court held that:

"Read together [sections 8(d) and 8(a) (5)], these provisions establish the obligation of the employer and the representative of its employees to bargain with each other in good faith with respect to 'wages, hours, and other terms and conditions of employment * * *.' The duty is limited to those subjects, and within that area neither party is legally obligated to yield. [citation omitted] As to other matters, however, each party is free to bargain or not to bargain, and to agree or not to agree." 356 U.S. at 349, 78 S.Ct. at 722.

■■ If a matter is within the language of section 8(d), it is deemed a mandatory subject of bargaining. Upon such a subject either party may insist on bargaining to an impasse. Subjects not within the language of section 8(d) are, on the other hand, deemed "voluntary." The parties are free to bargain on these voluntary subjects; but neither party may insist on them to impasse.[11] The good faith of the insisting party is no defense. See Borg-Warner, supra, 356 U.S. at 349, 78 S.Ct. at 722. The Court's theory in Borg-Warner was that insistence upon a non-mandatory subject "is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining." 356 U.S. at 349, 78 S.Ct. at 723.

The employer in that case insisted, admittedly in good faith, upon inclusion in the agreement of a "ballot" clause, i. e., a provision "calling for a pre-strike secret vote of [the] employees (union and nonunion) as to the employer's last offer." 356 U.S. at 343, 78 S.Ct. at 720. But the Court held that the "ballot" clause "settle[d] no term or condition of employment" and was therefore not a mandatory subject for bargaining. 356 U.S. at 350, 78 S.Ct. at 723. Answering the argument that the "ballot" clause was a partial "no-strike" clause, hence a mandatory subject of bargaining, the Court explained that:

"A 'no-strike' clause prohibits the employees from striking during the

9. Representative of the reviews of this legislative history are: N.L.R.B. v. Insurance Agents International Union, 361 U.S. 477, 483–487, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); N.L.R.B. v. American Nat. Ins. Co., 343 U.S. 395, 402–404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); Fleming, "The Obligation to Bargain in Good Faith," 47 Va.L.Rev. 988, 989–91 (1961).

10. Section 8(a) (1), 29 U.S.C.A. § 158(a) (1), which the Board found Arlington had also violated, provides that "[i]t shall be an unfair labor practice for an employer —to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."

11. There are likely to be, however, some matters that are not bargainable at all. See, e. g., McManemin, "Subject Matter of Collective Bargaining," 13 Lab.L.J. 985, 1001–05 (1962).

life of the contract. It regulates the relations between the employer and the employees. [citation omitted] The 'ballot' clause, on the other hand, deals only with relations between the employees and their unions. It substantially modifies the collective-bargaining system provided for in the statute by weakening the independence of the 'representative' chosen by the employees. It enables the employer, in effect, to deal with its employees rather than with their statutory representative." [12] 356 U.S. at 350, 78 S.Ct. at 723. See also, N. L. R. B. v. Darlington Veneer Co., 236 F.2d 85 (4th Cir. 1956).

■ In the present case, the basic question is whether the indemnity proposal was a mandatory subject of bargaining. We readily appreciate Arlington's position; but, in the light of the Supreme Court's decision in Borg-Warner, the only consistent view is that here the indemnity provision may not be considered a mandatory subject of bargaining.[13] We agree in fact with the Labor Board's conclusion that:

"The Court, finding [in Borg-Warner] that the ['ballot'] clause settled

no terms and conditions of employment and dealt only with the relations between employees and their union, held that the subject was not mandatory. Similarly here, the Respondent's indemnity proposal does not concern itself with the relations between Respondent and its employees. Rather, it deals with Respondent's relations with other employers and unions." 136 N.L.R.B. at 745.

That is, the nexus between the indemnity provision, which relates directly to compensation for lost business, and "terms and conditions of employment" is no closer than that between a "ballot" clause, which relates to avoidance of work stoppages, and "terms and conditions of employment." If anything, a "ballot" clause would seem to resemble a mandatory subject of bargaining more closely than does the indemnity provision.

■ With substantial consistency it has been held that neither union nor employer may insist to an impasse upon a performance bond because such a bond does not relate to "terms and conditions of employment." [14] The analogy between

12. The employer also insisted to impasse upon "a 'recognition' clause which excluded, as a party to the contract, the International Union which had been certified by the National Labor Relations Board as the employees' exclusive bargaining agent, and substituted for it the agent's uncertified local affiliate." 356 U.S. at 343–344, 78 S.Ct. at 720. As to this the Court said:
"The 'recognition' clause likewise does not come within the definition of mandatory bargaining. The statute requires the company to bargain with the certified representative of its employees. It is an evasion of that duty to insist that the certified agent not be a party to the collective-bargaining contract." 356 U.S. at 350, 78 S.Ct. at 723.

13. The suggestion is advanced by the employer that the proposed alternative solutions, set forth in the record, to the retaliation problem could be insisted upon to impasse. Without ruling on this, we merely note our skepticism: As to "an oral contract with written check-off au-

thorizations," see, e. g., section 8(d), 29 U.S.C.A. § 158(d); H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 523–526, 61 S.Ct. 320, 85 L.Ed. 309 (1941). As to "a contract applicable to non-AFL jobs only," cf., e. g., N. L. R. B. v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 350, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958) (discussion of the recognition clause); N. L. R. B. v. Darlington Veneer Co., 236 F.2d 85 (4th Cir. 1956).

14. See, e. g., Jasper Blackburn Product Corp., 21 N.L.R.B. 1240, 1254–56 (1940); Scripto Mfg. Co., 36 N.L.R.B. 411 (1941); Amory Garment Co., 80 N.L.R. B. 182, 193–94 (1948), enforced, 24 L.R. R.M. 2274 (5th Cir. June 3, 1949, memorandum opinion granting motion for enforcement by summary judgment); Brown and Root, Inc., 86 N.L.R.B. 520 (1949), modified on other grounds, sub. nom., N. L. R. B. v. Ozark Dam Constructors, 190 F.2d 222 (8th Cir. 1951); International Bhd. of Teamsters, Local 294 (Conway's Express), 87 N.L.R.B. 972, 978 (1949), enforced on other grounds, sub. nom., Ra-

the present insistence on the indemnity proposal and insistence on performance bonds appeals to us as reasonable. A performance bond is demanded to assure compensation for a breach of the collective bargaining agreement; the indemnity proposal here provides for compensation to Arlington by District 50 for damages that may result from action by third parties whose conduct is within the actual control of neither party to the agreement.[15] Both performance bond and indemnity clause are security devices. As the Board concluded, "Respondent's indemnity proposal cannot be found to be a mandatory subject because it, like the performance bond, is related to security for the contracting party (the Respondent) rather than relating to a benefit or security for the employees." 136 N.L.R.B. at 745–46. Though reasonable enough from the standpoint of an employer or union seeking protection, neither provision relates to "wages, hours, and other terms and conditions of employment" in the sense in which the phrase has been interpreted. See N. L. R. B. v. Wooster Division of Borg-

Warner Corp., 356 U.S. at 349, 78 S.Ct. at 723.

■ Arlington, however, insists that its proposal relates to the preservation of jobs as to which the Court of Appeals for the Second Circuit has said: "Nothing affects conditions of employment more than a curtailing of work, and such a curtailment is properly the subject of collective bargaining." N. L. R. B. v. Rapid Bindery, Inc., 293 F.2d 170, 176 (2d Cir. 1961). We do not understand that court to have said that any problem or proposal that might in any way bear upon curtailment of work "is properly the [mandatory] subject of collective bargaining." Rapid Bindery is in fact readily distinguishable from the case now before us. The issue decided in Rapid Bindery was that a problem involving job dislocation had to be submitted to bargaining; there was no question in the case as to whether an impasse could be properly reached on a particular proposal to meet the problem. In the present case the Board found that an impasse was reached on a particular proposal; the specific question is whether

bouin v. N. L. R. B., 195 F.2d 906 (2d Cir. 1952) ; Standard Generator Service Co., 90 N.L.R.B. 790 (1950), enforced on other grounds, 186 F.2d 606 (8th Cir. 1951) ; Taormina Co., 94 N.L.R.B. 884, 900 (1951), enforced on other grounds, N. L. R. B. v. Taormina, 207 F.2d 251 (5th Cir. 1953) ; I. B. S. Mfg. Co., 96 N.L.R.B. 1268, 1269 (1951), enforcement denied on other grounds, N. L. R. B. v. I. B. S. Mfg. Co., 210 F.2d 634 (5th Cir. 1954) ; id. at 639 (Rives, J. dissenting) ; Cosco Products Co., 123 N.L.R.B. 766, 769–70 (1959), enforcement denied on other grounds, N. L. R. B. v. Cosco Products Co., 280 F.2d 905, 910 (5th Cir. 1960) ; N. L. R. B. v. F. M. Reeves and Sons, Inc., 47 L.R.R.M. 2480 (10th Cir. 1960), cert. denied, 366 U.S. 914, 81 S.Ct. 1087, 6 L.Ed.2d 236 (1961), petition for adjudication of employer in civil contempt for disobeying decree of court, 273 F.2d 710 (10th Cir. 1959), enforcing an NLRB order, 121 N.L.R.B. 1280 (1958)—employer adjudged in contempt; Local 164, Brotherhood of Painters v. N. L. R. B., 110 U.S.App.D.C. 294, 293 F.2d 133, cert. denied, 368 U.S. 824, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961), enforcing, 126 N.L.

R.B. 997 (1960). Cf., e. g., N. L. R. B. v. Tower Hosiery Mills, Inc., 180 F.2d 701 (4th Cir.), cert. denied, 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596 (1950), enforcing, 81 N.L.R.B. 658, 661 (1949) ; N. L. R. B. v. Dalton Telephone Co., 187 F.2d 811 (5th Cir.), cert. denied, 342 U.S. 824, 72 S.Ct. 43, 96 L.Ed. 623 (1951), enforcing, 82 N.L.R.B. 1001, 1002–03 (1949).

15. Arlington contends that this is a matter over which District 50 has control. It says, "Obviously, it is wholly within the power of District 50 to comport its activity to the equally well-established union relationships in the construction industry." In view of Arlington's contention that the BCTU opposes all attempts to encroach upon what it considers its legitimate jurisdiction (see note 4, supra), it would seem that the only way District 50 could conform to the "well-established union relations in the construction industry," would be for it to abandon its attempts at organizing that industry. We do not agree that in any meaningful sense such self-abnegation is "control."

that proposal is a mandatory subject of bargaining, not whether the problem that generated the proposal had to be submitted to bargaining.

It is obvious that most matters that might be discussed or proposed in collective bargaining are likely to bear some relation, even if tenuous, to "wages, hours, and other terms and conditions of employment." But it would not necessarily follow that the indemnity proposal, insisted upon to impasse, is itself a mandatory subject of bargaining. Not all proposals that somehow respond to a problem that is customarily bargained about may themselves be insisted upon to impasse. Some proposals in response to the problem of strikes are mandatory subjects of bargaining. In Borg-Warner, however, the Supreme Court held that the "ballot" clause was not. Some proposals to reduce disruptions resulting from breaches of contract are mandatory subjects of collective bargaining, e. g., arbitration agreements. Yet, as we have seen, it has been consistently held that performance bonds are not mandatory subjects. It is the particular proposal, not merely the problem to which it is addressed, that must concern "wages, hours, and other terms and conditions of employment."

The Board and the Trial Examiner have found that an agreement would have been executed had it not been for Arlington's insistence upon the indemnity proposal. Accordingly, all that this court must decide is whether the indemnity proposal is a mandatory subject of bargaining. The indemnity clause bears no direct or reasonably certain relation to the protection of employees against curtailment of work. Its design, like that of performance bonds, is to secure the employer (or union) against loss. Only indirectly at best can Arlington's proposal be said to secure the employees their jobs, or affect the terms and conditions of their employment and thereby concern "the relations between the employer and the employees." Borg-Warner, supra, 356 U.S. at 350, 78 S.Ct. at 723. As the Board held, the indemnity proposal concerns or bears upon "Respondent's relations with other employers and unions." 136 N.L.R.B. at 745.

It is noteworthy that the outside forces whose intervention the employer fears are as completely beyond the union's control as the employer's. This contrasts sharply with the Rapid Bindery case where the critical decision to move the plant was made by the employer. And the proposal for indemnity which is pressed here goes beyond the performance bond cases, for here the employer seeks indemnity from the union, not for the union's default, but for conduct of unrelated third parties. Cf. N. L. R. B. v. George P. Pilling & Son Co., 119 F.2d 32, 38 (3d Cir. 1941); cited with favor in N. L. R. B. v. Darlington Veneer Co., 236 F.2d 85, 89 (4th Cir. 1956). Despite District 50's lack of control, Arlington appears to view the possibility of BCTU retaliation as an inherent defect in District 50. It refuses to accord the union the status to which it is entitled under the statute, as a collective bargaining agent, until this "defect" is cured. In this sense, the indemnity clause may be tantamount to a proposal for only qualified recognition; and such a proposal may not be bargained to an impasse. Cf. N. L. R. B. v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 350, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); N. L. R. B. v. Darlington Veneer Co., 236 F.2d 85 (4th Cir. 1956).

Arlington advances the ingenious contention that even if the indemnity proposal was not initially a mandatory subject of bargaining, it became one by reason of the lengthy consideration that it was accorded. The only support cited was Economy Stores, Inc., 120 N.L.R.B. 1 (1958). As the Board pointed out in its opinion in the case under review, "there was no majority holding to that effect in that case." 136 N.L.R.B. at 744 n. 4. The Board further held that even if such a rule were adopted, it would not be applicable to the facts in this case. We have not been persuaded that the Board was in error. In addition, the Supreme Court has said that "As to other

[non-mandatory] matters * * * each party is free to bargain or not to bargain, and to agree or not to agree." N. L. R. B. v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). A determination that a subject which is non-mandatory at the outset may become mandatory merely because a party had exercised this freedom by not rejecting the proposal at once, or sufficiently early, might unduly discourage free bargaining on non-mandatory matters. Parties might feel compelled to reject non-mandatory proposals out of hand to avoid risking waiver of the right to reject.

■ Arlington's final argument is that section 8(e) and (f), 29 U.S.C.A. § 158(e) and (f), 1959 amendments to the Labor Management Relations Act, compel the conclusion that its proposed solution to the problem of possible retaliation is a mandatory subject of bargaining.[16] The contention is that these provisions actually permit at least some of the retaliatory actions it fears from the BCTU.

It has not yet been authoritatively determined to what extent the BCTU may legally engage in activities injurious to Arlington. While we are bound to consider the fact that some retaliatory measures may be legally sanctioned, cf. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 171–174, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), the record in this case is too abstract for us to attempt a precise delineation of the conduct permitted by these statutory provisions. Cf. Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); Parks v. IBEW, 314 F.2d 886, 908 n. 30 (4th Cir. 1963), cert. denied, 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142.

That BCTU retaliation may be affirmatively sanctioned by the 1959 amendments to the Labor Management Relations Act has little bearing upon the question we are considering. At most the existence of affirmative legal sanction would support the argument that the potential problem of BCTU retaliation must be submitted to collective bargaining; it would not be particularly relevant to the question whether the indemnity provision itself may be insisted upon to impasse. We have not been directed to, nor have we found, any indication that Congress, in providing at least some remedies against abuse of sections 8(e) and (f), intended by the passage of these sections to modify the duty to bargain in good faith, in the manner suggested by Arlington. To repeat, not every lawful proposal that somehow relates to potential harm resulting from actions permitted by the 1959 provisions may be insisted upon to impasse regardless of whether it falls within the area of "wages, hours, and other terms and conditions of employment." On this record, and in the absence of at least a reasonably inferred congressional policy, this court is unable to read the requested limitation into the duty to bargain in good faith as defined by the Supreme Court in Borg-Warner.

Moreover, it is appropriate to remind Arlington, as the Board did, of the remedies that it may invoke pursuant to sections 10(l), 8 (b) (4), 8(e) and 303(b) of the Labor Management Relations Act, 29 U.S.C.A. §§ 160(l), 158(b) (4), 158 (e) and 187(b). In addition, since BCTU retaliation may have the effect of coercing employees not to select District 50 as their representative, relief against such retaliation may possibly be found under section 8(b) (1), 29 U.S.C.A. § 158(b) (1).

Our conclusion is in agreement with the Board's that "it is inconsistent with public policy to hold that public duties [e. g., the duty to bargain in good faith] may be set to naught because of alleged private inconvenience claimed to exist by reason of the actions or threatened actions of third persons." The Board having found a violation, we agree that such violation cannot be excused on the ground of this apprehended private in-

16. These sections relate to the legality of hot cargo clauses and pre-hiring collective bargaining agreements in the construction industry.

convenience.[17] McQuay-Norris Mfg. Co. v. N. L. R. B., 116 F.2d 748, 752 (7th Cir. 1940), cert. denied, 313 U.S. 565, 61 S.Ct. 843, 85 L.Ed. 1524 (1941).

Enforcement ordered.

17. Producers Produce Co., 23 N.L.R.B. 876, 908 (1940); accord, Arlington Asphalt Co., 136 N.L.R.B. 742, 747 (1962); see also, Local 19, International Bhd. of Longshoremen (Chicago Stevedoring Co.), 125 N.L.R.B. 61, 69 (1959), enforced in part, N. L. R. B. v. Local 19, Intern. Broth. of Longshoremen, AFL–CIO, 286 F.2d 61, 663–664 (7th Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

The courts have consistently held that economic and business exigencies will not justify employer action that infringes upon the statutory rights of its employees. See, e. g., N. L. R. B. v. W. L. Rives Co., 288 F.2d 511, 517 n. 10 (5th Cir. 1961); N. L. R. B. v. Bell Aircraft Corp., 206 F.2d 235, 237 (2d Cir. 1953); N. L. R. B. v. National Broadcasting Co., 150 F.2d 895, 900 (2d Cir. 1945); Idaho Potato Growers, Inc. v. N. L. R. B., 144 F.2d 295, 302–303 (9th Cir.), cert. denied, 323 U.S. 769, 65 S.Ct. 122, 89 L.Ed. 615 (1944); N. L. R. B. v. Hudson Motor Car Co., 128 F.2d 528, 532–533 (6th Cir. 1942). Cf. N. L. R. B. v. George P. Pilling & Son Co., 119 F.2d 32, 38 (3d Cir. 1941). And see N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (and cases cited therein).