RADIATOR SPECIALTY COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 9124.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 14, 1964.

Decided Aug. 3, 1964.

Whiteford S. Blakeney, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief) for petitioner.

Warren M. Davison, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and George B. Driesen, Atty., N. L. R. B., on brief) for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

The National Labor Relations Board has found that the Radiator Specialty Company: (1) interfered with, restrained and coerced its employees, (2) failed to bargain in good faith and (3) refused to reinstate 141 strikers upon their unconditional offer to return to work after an unfair labor practice strike, thus adjudging the Company in violation of §§ 8(a) (1), 8(a) (5) and (1), and 8(a) (3) and (1) of the National Labor Relations Act.[1] To review and vacate the covering Board order the Company has filed the present petition; to enforce the order the Board cross-petitions.

Substantial support exists in the evidence for the first finding, but we think none is there for the Board's conclusion that the Company did not bargain in good faith or that the strike was the result of an unfair labor practice entitling the participants to re-employment.

A manufacturer of automobile parts and specialties with its place of business at Charlotte, North Carolina, the Company was engaged in commerce within the intendment of the Act. After a Board-supervised election, the United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO (Union) was certified on September 15, 1961 as the bargaining representative of the Company's employees. The Union charged on February 2, 1962 that before and after the election the Company interfered with and coerced the employees in the exercise of their right to join a labor organization and to bargain collectively with the Company, contrary to the provisions of §§ 8(a) (1) and 7 of the Act. By an agreement of April 30, 1962, approved by the Regional Director of the Board, this grievance was settled.

---

1. 29 U.S.C. §§ 158(a) 1), 158(a) (5) and (1), and 158(a) (3) and (1).

Negotiations for an agreement between the Company and the Union commenced on October 4, 1961 and continued until August 7, 1962. A strike was called on May 15, 1962, upon the assertion that the employer had not bargained in good faith. Before the strike 29 meetings had been held; afterwards there were 8.

On May 11, just before the strike, the Union again charged the Company with refusal to bargain in good faith. By subsequent amendment the Company was accused of refusal on and after November 16, 1962 to meet with the Union at all. At the time of the strike, five substantial items remained in dispute: wages, hospitalization, overtime, liability of the Union in the event of a violation of the no-strike clause, and arbitration.

The Company declined to increase wages. A grievance procedure, consisting of four steps of conference between representatives of the Union and management, was propounded by the Company. The proposal was acceptable to the Union only with the addition of a fifth step, a provision for arbitration if the controversy was not settled at the earlier stages. Arbitration was rejected by the Company. The Union was agreeable to a no-strike stipulation, as was the Company, but the latter insisted on a liability clause in event of a breach which the Union thought exposed it to undue accountability.

In the discussions both the Union and the Company submitted contracts and each had offered counterproposals. Without success at the last encounter, August 7, 1962, no further effort was made until a telephone call from the Union on November 16 resulted in an engagement for November 20. This was subsequently postponed until November 30, but, on the day before, the Company advised the Union it would not attend unless a conciliator was present. The conciliator set December 6 for a meeting, but later he notified the parties of his inability to be present. Although the Union requested a meeting a week afterwards, there were no further negotiations.

On January 8, 1963 the Union wired the Company that the striking employees would abandon the strike and return to work unconditionally. Pursuant to this offer, 141 of the 153 strikers came to the Company's offices and expressed a willingness to resume employment. The tender was not accepted. Reinstatement would have meant the discharge of a like number of replacements.

A third charge was filed by the Union on January 24, 1963 accusing the Company of an unfair labor practice in its refusal to re-employ the strikers. It was supplemented to charge unlawful interference and coercion before and after April 30, 1962, the date of the settlement, and before and after the strike of May 15. The settlement was alleged to have been vitiated by the subsequent conduct. All of the charges were incorporated into a consolidated complaint.

The Board, to repeat, sustained all of the accusations. In the orders in review, it directed the Company to cease and desist from further interference and coercion and, affirmatively, required the Company to proffer the strikers immediate and full reinstatement, without prejudice to seniority privileges and to "make them whole for any loss of pay". Posting of notices of the order and compliance was directed.

■ I. In finding the Company guilty of a § 8(a) (1) offense, the Examiner considered the statements of the Company's supervisors both before and after the settlement. In this he held that the later utterances justified rescission of the order approving the settlement. Wallace Corp. v. NLRB, 323 U.S. 248, 253–55, 65 S.Ct. 238, 89 L.Ed. 216 (1944). These statements in many instances consisted of assertions that the Company would never sign a contract. Not only had the supervisors been instructed not to disparage unionization in any manner, but on January 17, 1962 in a letter to all employees the Company indicated that it was in fact engaged in contract negotiations.

There is evidence, however, of other remarks by supervisors named by the

Examiner which gives support to his conclusion. While these were scattered and frequently induced by employees' questions, we cannot say that the Examiner, and the Board in accepting his findings, did not act upon substantial evidence. Accordingly, the cease and desist order should be enforced.

■■■ II. The fact findings of the Examiner and the Board, however, do not justify the determination that the Company was not bargaining in good faith. It must constantly be recalled that the Act does not require the employer to agree with the bargaining agent, even in respect to "wages, hours and other conditions of employment". The sole mandate of the Act is that the employer endeavor in good faith to reach an accord with the Union. § 8(d). The record brims with proof of spirited bargaining. Whether there was good faith must be gathered from the words, acts and motives of the parties. Solo Cup Company v. NLRB, 332 F.2d 447 (4 Cir. May, 1964), with opinion by Chief Judge Sobeloff. Here the circumstances do not negate its immanence throughout the meetings.

Bargaining began with a conference on October 4, 1961, lasting a little more than an hour and consisting of introductions and a relation of a few of the grievances. Although the Union desired an earlier resumption, the next meeting was scheduled at its instance for October 24. Apparently through a misunderstanding, the Union did not appear and an adjournment was arranged for October 27.

On this day the Company granted certain merit wage increases, and the parties reviewed each clause of a contract submitted by the Union. Immediate objection was pressed by the Company to the omission of the Union as a contracting party. A local, not then created, had been named in its place. The Company insisted upon its right to look to the Union, as the representative, for compliance with the agreement.

November 6 was agreed upon for the next parley in order to permit the Company time to study the Union proposals. The Company supplied the Union with wage and classification information previously requested. Additionally, the Union's proposals were reviewed and the meeting recessed until November 17.

During a two-hour gathering on November 17, the Company presented its proposals, including the two stipulations which became major differences. The first was a grievance procedure: to begin with informal interviews between the Union and the Company and end with a fourth step consisting of submission of the problem to representatives of the Union and Company "for final discussion and settlement". Similar levels of conference were embraced in the Union's draft, but added was the disputed provision for decision by an impartial arbitrator. A decision affecting the two parties by anyone outside the plant was unacceptable to the Company. On the other hand, the Union saw chaos in terminating attempts at resolution of controversies at the level of partisan representatives, because failure of agreement there would leave the problem a live and festering issue.

The second troublesome feature in the Company's document was the "no-strikes, no-lockouts" clause. It prohibited lockouts, and it reserved to the employees all legal rights and recourse against the Company for recovery for injuries arising from any direct or indirect breach of the provision by the Company. On the other side, the clause outlawed any strike, walkout or similar work stoppage, as well as picketing and concerted action, having the effect of interrupting the Company's production. No opposition to the covenant itself was voiced, but the recital of the Union's liability for its breach was vigorously resisted as phrased altogether too broadly.

Because of other engagements, the Company's vice president and general manager who had led negotiations for the Company was occupied until November 30. The Union noted its objection to the delay and offered to assemble during weekends. On November 30, as well

as on December 1, the two parties tendered other drafts.

December 7 was a day of disruptive events. Before the meeting convened the Union representative asked for the release from work of the employees constituting the Union's committee so that they might be present. The list contained 38 names. The Company demurred to the withdrawal of so many employees from work and on so short notice, as well as for the overcrowding of the conference room by this many committeemen. Nevertheless, the Company assented, shut down a section of its plant and adjourned to the Y.M.C.A. building. This assemblage lasted 5 hours, dispersing at 9 o'clock that night.

By letter of December 12 the Company replied to the Union's plaint about the long intervals between meetings. After remarking upon the serious amount of time the Company had been deprived of the services of its officers by the negotiations, it stated, "nevertheless, we will set aside everything we can in order to push ahead toward the completing of an agreement between us". Also, the Company requested a reduction in the size of the employee committee.

The Union representative, commenting upon the size of this committee, said that he knew the presence of so many at the bargaining sessions was "bound to" suspend plant production and that in one session these committeemen were "jumping up and jabbering, giving speeches, putting on acts". He acknowledged that the aim of the "big committee" was to force concessions from the Company by harassment tactics.

Meetings followed on December 14 and 19, all of them with the large committee. The Union expressed its willingness to accede to the position of the Company on some of the issues if the Company would alter its insistence in respect to arbitration, seniority and the wording of the no-strike clause. Over the objection of the Union, the next meeting was respited until January 10, the Company giving the Christmas closure of the plant as its principal reason.

There were at least 15 more meetings between the middle of January and April 27, 1962. The Company offered a revised draft on January 17, which included an equalization of hours in accordance with the plan of the Union. It also allowed more generous holiday compensation. Vacation benefits were expanded to approach the Union demand, but no modification was made in the wage, liability or arbitration items. A conference on January 24 was marked by personal abuse of the Company's representative by the Union leader and questioning of his truthfulness.

At the February 5 session a conciliator from the United States Department of Labor attended and at his request the employee committee was reduced to its initial six. Because of the general manager's engagement in Company litigation for two weeks, conferences were not renewed until March 6, when another representative came in for the Union. The Company placed the blame for the deadlock on the Union's prior intermediary and agreed to two bargaining sessions on that day, one of 2½ hours and the other 2 hours, morning and afternoon.

Meetings of this nature continued at approximate weekly intervals until the strike began at 5:30 A.M. on May 15. The conferees were then apart on wages, hospitalization, overtime, seniority, liability and arbitration. Some substantial matters had been agreed upon, such as hours of work, management prerogatives, safety and housekeeping, termination, equalization of hours, holidays and general rules.

Between the strike and the last gathering on August 7, 1962, there were, as already mentioned, 8 meetings. In one of them, June 20, the Union informed the Company that it was willing to make any type of retractions that were "honorable". Finally, the Union asked if the Company would agree to the Union terms on wages, liability and hospitalization if

the Union withdrew its other disputed proposals. Later this proposition was reduced to the two issues of wages and liability, the Union offering to compromise the differences on arbitration by giving the Company the right to select the arbitrator. None of these suggestions was agreeable to the Company and no further conferences were held.

It seems to us that want of good faith in bargaining is more justly to be ascribed to the Union. To begin with, its reluctance to become a party to the contract at all hardly evinced a willingness to enter into a bargain. Next, an attempt was made to hinder production, to overawe management and break up the meetings by exaggerating the size of the Union committee and behaving as a rabble. A diatribe upon the Company's negotiator personally was the last resort. The Company's consent to continue to confer in the face of this conduct exhibited considerable good faith in bargaining.

But the Board says default of the Company is proved by its persistence in the adoption of a non-mandatory bargaining subject into the agreement, that is the liability clause. We do not see the clause in this light. It is entirely different from an indemnity requirement, such as was involved in NLRB v. Davison, 318 F.2d 550 (4 Cir. 1964). Nothing more was demanded of the Union to secure the solvency of its promise, as in that case and in North Carolina Furniture, Inc., 121 NLRB 41. The no-lockout, no-strike terms were considered appropriate by both parties. A corresponding liability provision was included in the Company's covenant. Since the no-lockout, no-strike terms are mandatory bargaining subjects, NLRB v. American National Insurance Co., 343 U.S. 395, 408 n. 22, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); NLRB v. Wooster Division of Borg-Warner Corp., 236 F.2d 898, 903 (6 Cir. 1956), aff'd in part, rev'd in part, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), a statement of their enforceability would not seem to be a foreign feature.

If, however, liability was not of mandatory character, it was quite harmless, for the clause was no more, as the Examiner concluded, than a declaration of the law. It read:

"If the Union, either directly or indirectly, authorizes, promotes, supports or condones any violation of any provision of this paragraph, the Company shall have such rights and recourse as the law may provide and the Union shall be subject to such liability as the law may provide, including liability for any and all injury or damage which may result from such violations. * * * "

We do not understand how in good faith its inclusion could be resisted. Either alone or in conjunction with a concededly mandatory item, it cannot be treated as a factor of impasse in the negotiations.

At the end the parties were unagreed upon wages, arbitration, seniority and overtime. Regardless of other concessions and recessions, neither party would relent on wages. This was their prerogative and privilege, but nevertheless it was the cause of the bargaining failure.

■■ III. Nor did the § 8(a) (1) violations themselves justify the strike. They were slight, without frequency and too fragmentary. It was a wholly economic work stoppage; it was not the result of any unfair labor practice. With the refusal to bargain unproved, the strike had no standing save as one to force the Company to surrender to the Union's terms. Hence the employees who went out cannot be held entitled to their old jobs. The opposite conclusions of the Board are not supportable in fact or in law.

We will enforce the Board's cease and desist order, including the posting of the notice thereon required by the Board. We do not enforce so much of the order as requires reinstatement of the strikers, discharge of their replacements and payment of wages to the strikers during their absence.

Order enforced in part and vacated in part.

SOBELOFF, Chief Judge (concurring in part and dissenting in part).

Giving due weight to the protection of free speech under section 8(c) of the Act, the Board absolved the company of a charge under section 8(a) (1) based on the president's speeches to employees. At the same time the Board found a violation of section 8(a) (1) in certain other statements of its supervisor, personnel manager and two foremen, made and persistently repeated in the course of negotiations after the election and before the strike. The Board restrained the employer from interfering with and coercing its employees, and the court properly grants enforcement of the Board's order; and in this part of the court's opinion I concur.

The Board also found that the repeated declarations (that the employer would under no circumstances sign any contract with the union) reflected management's true state of mind not to bargain in good faith as required by section 8(a) (5). Predicated upon these further findings, the Board held that the strike which commenced on May 2, 1962, was an unfair labor practice strike and that the strikers were entitled to reinstatement. There is no reason to reject these further findings since they are substantially supported in the record. Admittedly, a remark made in anger by an employer, at an early stage, that he will never sign a contract would not be conclusive proof that he did not later reconsider and bargain sincerely as the law commands, but when such declarations have been made repeatedly by responsible company spokesmen it becomes a question of fact whether the original state of mind continued or was abandoned. Mere attendance at protracted meetings, made sterile by a party's fixed determination not to reach any agreement, is not a discharge of the obligations imposed by section 8 (a)(5). NLRB v. American National Ins. Co., 343 U.S. 395, 402, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). "Surface bargaining" is not enough. NLRB v. Whittier Mills Co., 111 F.2d 474, 478–79 (5th Cir. 1940).

I am not unmindful of the union's extreme reaction to the employer's recalcitrance, and I do not condone the union's conduct which Judge Bryan has described in moderate terms. However, as the Board found, this was not the cause of the breakdown in the negotiations. Moreover, no charge of unfair labor practices was lodged against the union, and it is highly doubtful if the facts would support such a charge if made, Cf. NLRB v. Insurance Agents, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).

I would therefore enforce the Board's order in its entirety, requiring reinstatement of the employees and ordering the parties to resume bargaining in a good faith endeavor to achieve accord.