401 F.2d 682
 The KROGER COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and
Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, Intervenor, and
Retail Clerks International Association, AFL-CIO, Intervenor.
AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL-CIO, Petitioner, and
Retail Clerks International Association, AFL-CIO, Intervenor,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and
The Kroger Company, Intervenor.
 Nos. 17895-18011.
 United States Court of Appeals Sixth Circuit.
 October 10, 1968.
 
 Nicholas Unkovic, Pittsburgh, Pa., (Leonard L. Scheinholtz, Scott F. Zimmerman, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., J. Mack Swigert, Taft, Stettinius & Hollister, Cincinnati, Ohio, Norman Diamond, Arnold & Porter, Washington, D. C., William Keller, Clark, West, Keller, Clark & Ginsberg, Dallas, Tex., on the brief), George A. Leonard, Cincinnati, Ohio, of counsel, for Kroger Company.
 Bernard Dunau, Washington, D. C. (Lester Asher, Chicago, Ill., for Retail Clerks International Association, AFL-CIO, S. G. Lipman, Donald Grody, Washington, D. C., on the brief), for Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO.
 Peter Ames Eveleth, National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty. N. L. R. B., Washington, D. C., on the brief), for National Labor Relations Board.
 Before O'SULLIVAN and PHILLIPS, Circuit Judges, and CECIL, Senior Circuit Judge.
 CECIL, Senior Circuit Judge.
 
 
 1
 Cause No. 17895 is before the Court upon petition of The Kroger Company (herein called Kroger or the Company) for review of an order of the National Labor Relations Board issued on May 5, 1967. Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO (herein called Meat Cutters), one of the charging parties, intervened in cause No. 17895, and in cause No. 18011 petitioned for review of portions of the same order. The Board cross-petitioned for enforcement of its order in full. Retail Clerks International Association, AFL-CIO (herein called Retail Clerks), also a charging party, intervened in both causes. The Kroger Company intervened in No. 18011. The Board's decision and order are reported at 164 NLRB No. 54. The cases on review have been consolidated for briefing, oral argument and filing of a joint appendix. This Court has jurisdiction because Kroger is an Ohio corporation with its principal office in Cincinnati. Section 160(f), Title 29, U.S.C.
 
 
 2
 Separate charges were filed by Meat Cutters on September 10, 1965, and by Retail Clerks on December 10, 1965, charging Kroger with violating Sections 8(a) (1), (3) and (5) of the National Labor Relations Act (herein called the Act). The cases were consolidated for hearing before the Trial Examiner. The Trial Examiner sustained the charges which were affirmed by the Board.
 
 
 3
 Kroger operates a large retail grocery chain with stores in many parts of the United States. We deal here with a company which has no animus toward unions. It has a long history of negotiating contracts with the two unions involved herein and over ninety-five percent of its employees are members of unions. The matter in issue concerns the company's pension and profit-sharing programs, which, because of the amount of money involved, is of great interest to all of the parties.
 
 
 4
 In 1947 Kroger established the Employees' Retirement Income Plan. This plan provides lifetime retirement to all employees retiring at age 65 with 15 years of service. Retirement income is based upon an employee's length of service and average annual earnings with a minimum level of benefits guaranteed. There are other details of the plan, such as early retirement for reasons of health etc., not necessary to state here. An essential characteristic of this plan is that it is non-contributory, the cost being borne entirely by the company. It is not funded and the payments are carried as a part of current expenses. The employee has no vested interest beyond his income for life whether he lives only a few weeks or for many years. A death benefit of $500 is paid to a designated beneficiary of a retired employee.
 
 
 5
 The Employees' Savings and Profit Sharing Plan, the real subject of this controversy, was established by the company in 1951. Participation in this plan, for those employees who met eligibility requirements, was entirely voluntary. They could join and withdraw at will. An eligible employee could deposit with the company as much as 5 percent of his salary up to a maximum of $15 per week. These moneys were deposited in a savings fund known as Fund A and invested by Kroger-appointed trustees. Kroger annually contributes a percentage of its profits to a separate fund, known as Fund B which is invested in Kroger stock and other securities. At the end of each year, through accounting procedure, not necessary to detail here, the participating employee is credited with a proportionate share of the deposits and earnings of each fund. Upon withdrawal from the plan an employee receives all of his A Fund credit and a proportionate part of his B Fund credit equal to 5% for each year of participation. All withdrawals by an employee are in a lump sum and in the total amount of his interest in the funds. Membership in the plan is terminated upon retirement or other separation from employment. The benefits of this plan to an employee are substantial. In 1965, the company contributed over $4,000,000 of its profits to this plan. In this same year, for every dollar deposited in the savings fund, the employee was credited with $1.19 of Fund B credits.
 
 
 6
 In 1956, by resolution of the Kroger Board of Directors, both the retirement and the savings and profit-sharing plans were modified by the insertion of a new paragraph in each. To the Savings and Profit-Sharing Plan a paragraph identified as paragraph 4 was added as follows:
 
 
 7
 "Notwithstanding the foregoing provisions, any employee who is covered by a limited group pension plan as herein defined shall cease to be eligible hereunder and, if a member of this Plan, shall be considered to have withdrawn therefrom on the date when such coverage commenced. The term `limited group pension plan' means a plan for the payment of pensions or other retirement benefits which (a) is limited in its coverage to a particular group of employees, and (b) is established by or at the request of the covered employees or their authorized representatives."
 
 
 8
 Again, in 1962, by resolution of the Board of Directors, a further clarifying provision was added:
 
 
 9
 "Every employee who is a member of a group of employees or of a collective bargaining unit which establishes or adopts a limited group pension plan for any employees of the Company (regardless of whether or not such employee participates therein) shall, for the purposes hereof, be deemed `covered' thereby.
 
 
 10
 "The term `coverage commenced' as used above shall mean the time when the Company, any group, collective bargaining unit, or employee first becomes obligated to accrue or to make payments or contributions to such limited group pension plan."
 
 
 11
 At the same time a comparable exclusionary provision was placed in the Retirement Plan. Membership in a union which has negotiated its own pension plan with Kroger excludes all such employees from participation in Kroger's Pension and Profit-Sharing Plans.
 
 
 12
 We consider first the grounds for review in cause No. 17895. Each of the basic allegations of unfair labor practices appearing in the consolidated complaint is grounded upon Kroger's claimed maintenance and enforcement of paragraph 4 of the Savings and Profit-Sharing Plan. The Board ordered the company under the heading of affirmative action to
 
 
 13
 "(a) Amend its Savings and Profit Sharing Plan by deleting therefrom those portions of Paragraph 4 which disqualify or exclude from participation employees covered by a pension plan resulting from collective bargaining through a labor organization.
 
 
 14
 "(b) Amend its existing employee booklets and/or publications so as to eliminate therefrom any language which indicates that employees covered under a pension plan resulting from collective bargaining through a labor organization are disqualified from participation in its Savings and Profit Sharing Plan."
 
 
 15
 The question arises whether paragraph 4 is a violation of Section 8(a) (3) of the Act.
 
 Section 8(a) (3) provides:
 
 16
 "It shall be an unfair labor practice for an employer — by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *"
 
 
 17
 Kroger contends that the essential elements of an 8(a) (3) violation — discrimination, discouragement of union membership, and unlawful intent or motive — are lacking in this case. National Labor Relations Board v. Brown, 380 U.S. 278, 286, 85 S.Ct. 980, 13 L.Ed.2d 839.
 
 
 18
 The company seeks to justify its position by the following statement in its brief:
 
 
 19
 "Kroger has never — through bargaining or by reason of amended Section 4 — required any member of the charging unions to withdraw from profit sharing without bargaining with the unions and granting the unions an agreeable substitute. The bargaining history shows that Kroger's primary goal was to obtain continued participation of all employees in the Kroger Program — both pensions and profit sharing. Even while retreating from this bargaining position and agreeing to contribute to a negotiated pension plan, Kroger has always extended to the charging unions the option of continued participation in the Kroger Program, including profit sharing. In every instance where employees withdraw from the Kroger Program, it was because they, or their union representatives, preferred a union-negotiated pension plan over continued participation in the Kroger Program."
 
 
 20
 This statement is based upon two assumptions, one, that the pension plan and the savings and profit-sharing plan of the company's retirement program constitute one unit and cannot be split or separated for bargaining purposes, and, two, that collective bargaining agreements have been entered into through good faith bargaining. Neither of these assumptions are supported by the evidence, as we shall hereafter demonstrate.
 
 
 21
 It is clear that paragraph 4 is discriminatory. It is obvious that "limited group pension plan" means a union pension plan. While "union" is not mentioned, neither is any other group which could possibly offer a pension plan to Kroger employees. The benefits of the profit-sharing plan, which are a form of compensation, are substantial. They cannot be considered of slight benefit to the employees and they are denied to the employees who participate in a union pension plan, where as they are not denied to other employees.
 
 
 22
 The company cites the fact that Kroger is over 95% unionized as proof that paragraph 4 did not discourage union membership. This is not a fair test. Many of the union contracts had a provision that employees had to be a member of the union in order to hold their jobs. It was therefore, not a question of choosing between the union and the profit-sharing plan of the company, rather it was a choice between the union and a job. Given a free choice, the necessity of having to give up the substantial benefits of the profit-sharing plan would naturally have some deterring effect on union membership. As said by the trial examiner,
 
 
 23
 "(I)t is not the quantum of restraining effect upon the employees' desire or freedom to join a union that determines the legality or propriety of repressive conduct under this statute. It is enough that the behavior complained of, or the rules of conduct unilaterally imposed and enforced by the employer, tend in that direction. The act does not requires that `this change in employees' `quantum of desire' to join a union have immediate manifestations' (Radio Officers' Union [etc.] v. N. L. R. B., 347 U.S. 17, 51 [74 S.Ct. 323, 98 L.Ed. 455])."
 
 
 24
 While there may be no specific intent shown to discriminate against union members and to discourage union membership, employer action which in itself has this effect is unlawful. The Court said in Radio Officers' Union, etc. v. National Labor Relations Board, supra, at p. 45, 74 S.Ct. at p. 338:
 
 
 25
 "This recognition that specific proof of intent is unnecessary where employer conduct inherently encourages or discourages union membership is but an application of the common law rule that a man is held to intend the foreseeable consequences of his conduct."
 
 
 26
 See also, National Labor Relations Board v. Erie Resistor Corp., 373 U.S. 221, 227, 83 S.Ct. 1139, 10 L.Ed.2d 308; Local 357, International Brotherhood of Teamsters, etc. v. National Labor Relations Board, 365 U.S. 667, 675, 81 S. Ct. 835, 6 L.Ed.2d 11; Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372, rehearing den. 325 U.S. 894, 65 S.Ct. 118, 89 L.Ed. 564.
 
 
 27
 As we shall hereinafter point out, Kroger maintained its position as stated in paragraph 4 and refused to permit its negotiators to discuss its savings and profit-sharing plan. The Company must therefore be held to have intended whatever effect paragraph 4 had with respect to union organization and membership.
 
 
 28
 The Company seeks to negative an unlawful motive by showing that it had a legitimate and substantial business justification for adopting and maintaining paragraph 4. After Kroger established the savings and profit-sharing plan in 1951, it treated it and the retirement income plan as a single, unified retirement plan. Kroger took the position that the plans could not be separated or "split". If a union pension plan was adopted in negotiations, the employees covered by such plan could not participate in the savings and profit-sharing plan.
 
 
 29
 Kroger argued that since it generally agreed to the industry package, including the provision for the establishment of a union-industry pension plan, the granting of the unions' additional demand for the continuance of the profit-sharing plan would have increased its costs substantially beyond that of its competitors. Further, the entire Kroger retirement program cost less than any of the pension plans proposed by the unions. Kroger argues, too, that the combined plans have a common purpose of providing retirement security for its employees, by supplementing the non-contributory retirement plan with a participating savings plan. It tends to attract and keep good employees, a decided advantage for the company.
 
 
 30
 As important as these arguments are, they do not justify an arbitrary position that the retirement plan and the savings and profit-sharing plan constitute an inseparable retirement unit. The two plans were established at different times and must be administered separately, albeit they might be administered by the same department. Pensioners might not participate in the savings plan. At any rate, they would have withdrawn their savings fund when they retired. Since the pension is paid from current earnings, the payment of their pension would be much the same as the continuation of the payment of their salaries. Participation in the savings and profit-sharing plan is voluntary and many employees apparently withdraw their money from the A Fund before retirement. Complicated bookkeeping is involved. Individual accounts must be kept continuously for each participant. We can see no relation between the two plans that would require them to be tied together. The argument that the company might be obligated to two separate and independent retirement programs benefiting the same employees is without merit. As the profit-sharing plan would add security, for the employees, beyond the company's pension plan, so it would also add security for the employees in a union pension plan. Vicepresident Parker, while referring to the two plans as "one program" conceded "obviously, it can be split." Profit sharing, therefore, may be a subject of collective bargaining, independent of the subject of pensions. It has been held that profit sharing is a mandatory subject for bargaining between employers and unions. National Labor Relations Board v. Black-Clawson Co., 210 F.2d 523 (C.A. 6).
 
 
 31
 We conclude that there is substantial evidence to support the finding of the Board that the Company's maintenance and enforcement of paragraph 4 in its savings and profit-sharing plan and in the employees' booklets and literature is a violation of Section 8(a) (3) of the Act.
 
 
 32
 Kroger is charged with refusing to bargain on the subject of profit-sharing, in violation of Section 8(a) (5) and (1) of the Act. Kroger denies the charge. In support of its denial, it claims that in every instance where employees represented by the charging unions withdrew from participation in the Kroger Savings and Profit-Sharing Plan, the withdrawal occurred subsequent to a contract in which the union and Kroger had specifically agreed in writing that the employees would withdraw from further participation in the Kroger program at the time Kroger commenced contributions to the union negotiated pension plan.
 
 
 33
 In spite of the claim that the unions gave up their demands for employee participation in profit-sharing plans, as a result of good faith bargaining and agreement, the evidence is to the contrary. The trial examiner found that
 
 
 34
 "(O)n the record in its entirety, that the Respondent (Kroger) in fact refused to discuss with any of the union representatives, and therefore literally refused to bargain about, either the possibility of viewing its Retirement Plan and Savings and Profit-Sharing Plan as separate negotiable conditions of employment, or the possibility of altering its profit-sharing plan for union represented employees, or substituting some other benefit in its place."
 
 
 35
 We conclude that this finding, sustained by the Board, is supported by substantial evidence. The resolutions of the Board of Directors, as evidenced in paragraph 4 of the employees' information booklet, the apparent policy of the company, the attitude of the company's negotiators, all as detailed in the findings of the trial examiner, demonstrate that the savings and profit-sharing plan of Kroger was "out of bounds" and beyond the authority of the Company's negotiators for discussion at the bargaining table. It is not enough to show that there was a clause in a contract or a supplement thereto agreeing to the exclusion of participation in that plan. It is obvious from the evidence that union negotiators were given to understand at the outset that that was a subject which could not be the subject of negotiation. Such an attitude is inconsistent with good faith bargaining. National Labor Relations Board v. Insurance Agents' Intern. Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454.
 
 
 36
 The conclusion of the Board that Kroger violated Section 8(a) (1) and (5) of the Act is supported by substantial evidence.
 
 
 37
 While we have found that the company violated Sections 8(a) (1), (3) and (5) of the Act, we do not consider that the order of the Board pertaining to restoration is appropriate. Section 2(d) of the order provides:
 
 
 38
 "Restore, in a manner to be determined hereinafter at the compliance stage of this proceedings, to the status in the Kroger Savings and Profit Sharing Plan which they would have enjoyed had they not withdrawn from the Plan, all those employees who were required, on or after March 13, 1965, to withdraw from the Plan in consequence of the terms of Paragraph 4 of that Plan pertaining to coverage by collective-bargaining agreements, as explained above under `The Remedy'."
 
 
 39
 The record does not support a finding that paragraph 4 of the Savings and Profit-Sharing Plan was deliberately used by Kroger to discourage membership in the involved union, albeit its use might have had such result. The company's long history of dealing with unions would indicate that it had no inherent animus against unions as such.
 
 
 40
 We do not consider that a punitive order denominated as a remedy is called for, nor should Kroger employees be provided a "windfall" that could accrue from a working out of the complications inherent in obedience to 2(d) of the Board's order.
 
 
 41
 "The power to command affirmative action is remedial, not punitive, and is to be exercised in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act." Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126. See also, Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 10, 61 S.Ct. 77, 85 L.Ed. 6; Local 60, United Brotherhood of Carpenters, etc. v. National Labor Relations Board, 365 U.S. 651, 655, 81 S.Ct. 875, 6 L.Ed. 2d 1.
 
 As the trial examiner said:
 
 42
 "Equitable restoration of employees adversely affected by the unfair labor practices found, to the status as participants in the Savings and Profit Sharing Plan which they would otherwise have enjoyed, presents very complex problems with multiple ramifications."
 
 
 43
 In a plan that is voluntary as to employees' participation, voluntary as to the amount invested by each employee and voluntary as to the time of withdrawal, the employees who might have participated cannot now be put in the status that they would have been in had they been permitted to exercise their rights to invest in the Savings and Profit Sharing Plan. Neither can Kroger be put in status quo. The examiner said further:
 
 
 44
 "In the circumstances, and absent expert advice on the problem, the sundry details of this aspect of the remedy are best left to amicable adjustment by the parties at the compliance stage of the proceedings."
 
 
 45
 Any effort to make such a determination would be pure speculation. This situation is not comparable to the case of a discharged employee who can be put back to work with a restoration of the wages he would have received had he not been discharged.
 
 
 46
 Having come to the conclusion that this part of the Board's order should not be enforced, we do not reach the question presented by the petition for review of the Meat Cutters in cause No. 18011.
 
 
 47
 Our sanction of the Board's order to require Kroger to bargain collectively with the unions on the subject of the Savings and Profit-Sharing Plan does not mean that we hold that the company is bound by the plan as it was at the time the withdrawals were made. We hold that the company must bargain in good faith on the subject. Section 8(d) of the Act provides,
 
 
 48
 "(T)o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession: * * *"
 
 
 49
 See, National Labor Relations Board v. American Nat. Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027; NLRB v. H. E. Fletcher Co., 298 F.2d 594 (C.A. 1); Radiator Specialty Company v. NLRB, 336 F.2d 495 (C.A.4).
 
 
 50
 In general we find the trial examiner's decision to be a correct statement of the facts and the law of the case. Subject to the above discussion, we enforce the order of the Board, except paragraph 2(d) pertaining to restoration of employees in the Savings and Profit-Sharing Plan.