NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

AMERICAN COMPRESS WAREHOUSE,
DIVISION OF FROST–WHITED
COMPANY, Inc., Respondent.

No. 21365.

United States Court of Appeals
Fifth Circuit.

July 12, 1965.

Rehearing Denied Sept. 7, 1965.

Herman M. Levy, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Arnold Ordman, Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., for petitioner.

Joe P. Mathews, Dallas, Tex., for respondent.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

The Board petitions the Court for enforcement of its order which found that the Respondent Company violated section 8(a) (5) and (1) of the National Labor Relations Act by refusing to bargain collectively with the Union;[1] and violated section 8(a) (3) and (1) of the

Act by refusing to re-employ Andrew Baylock, Jr.[2]

The questions to be decided are: 1. whether substantial evidence supports the Board's finding that the Company insisted as a condition to an agreement that the collective bargaining contract contain a performance bond provision; 2. if so, whether the Company, by so insisting upon a performance bond, violated section 8(a) (5) and (1) of the Act; and 3. whether substantial evidence supports the Board's finding that the Company violated section 8(a) (3) and (1) of the Act by refusing to re-employ Andrew Baylock, Jr.

### 1. *Performance Bond—The Facts*

█ The Company has its principal office in Shreveport, Louisiana, where it is engaged in the warehousing and compressing of cotton. It also maintains places of business in Natchitoches, Alexandria, and Opelousas, all in Louisiana. About April 30, 1962, the Board, following an election, certified the Union as the exclusive bargaining representative for employees in a unit comprising production and maintenance employees, laborers, seasonal and casual employees at the Company's cotton compresses in the four Louisiana cities. J. K. Boone was general manager of the Company. R. E. Dupuy and Eddie Stahl were plant superintendent and foreman, respectively, at the Shreveport compress. Edward D. Shanklin and Alvin A. Vicknair were field representatives and chief negotiators for the Union.

In the period June 4 to October 10, 1962, the parties held six bargaining meetings with Vicknair and Shanklin, plus two employees representing the Un-

---

1. United Packinghouse, Food and Allied Workers, AFL-CIO.

2. Section 8(a), 29 U.S.C. § 158(a), provides in pertinent part:
    "(a) It shall be an unfair labor practice for an employer—
    "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"* * * *
    "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membershp in any labor organization. * * *
    "* * * *
    "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title."

ion, and Boone and Dupuy appearing on behalf of the Company. At the June 4 meeting, the Union presented the Company with a brief summary of its demands. Boone complained that the summary was too vague and the Union agreed to submit a complete contract proposal. About June 7, the Union mailed a proposed contract to the Company. At the June 13 meeting, the Company presented its contract proposals providing, inter alia, for a performance bond, a no-strike no-lockout clause, and a nonobservance of picket line provision.[3] At the June 13 meeting, according to Shanklin, "the company strenuously said that they wanted to have, they had to have, before we could reach an agreement, certain portions of the contract which we strenuously objected to. Now these were the portions or sections that the company said they had to have." At the June 27 meeting, Shanklin testified that they went down the Company's proposal and agreed on a number of the clauses, but,

"Non-Observance of Picket Lines; we told the company we could not go along with that. That was completely contrary to what we considered a Non-Observance of Picket Lines which we could not go along with. That clause the company insisted upon in order to reach an agreement. This was a must that had to be part of the contract.

"Performance Bond; we didn't agree with that. We told the company that was out completely. The company took a strong position that they had to have that and then made the indication that we were irresponsible people and that this would be one way to be sure that we would honor the contract if we signed the Performance Bond. The Performance Bond had to be part of the contract otherwise there would be no contract as far as they would be concerned.

"This is in the way of Mr. Boone speaking for the company."

Boone testified:

"A. We had a disagreement on Non-Observance of Picket Lines and we had a very lengthy discussion and disagreement on our proposal on the Performance Bond.

"Q. All right. In connection with those two provisions, will you tell us, as closely as you can remember, what you told the union people about those provisions and what they told you?

"A. Well on the Non-Observance of the Picket Lines, I told the union that I was looking for some protection that would enable us to get our employees on the job in the event that we had heavy construction going on and those people were on strike, in the event the railroads were on strike or possibly even in the event that this same union was on strike at another plant for which we handled cotton for, that I was not asking them to cross their own picket lines but I was merely asking them to come to work and do the work which they were hired to perform. I was told that they have never agreed to any such article, any such language and that they had no intentions and I was told should this event ever come up that they and myself could sit down and work these things out at that particular time.

"Q. Now, Mr. Boone, when you say 'they' who actually told you that, if you remember, what union representative?

"A. Mr. Vicknair.

"Q. What about the Performance Bond, you remember what you said, if anything, about that and what the union people said to you about it?

"A. Well, on the Performance Bond we merely asked for some type of protection in this contract that we were about to enter into

---

3. The three proposed provisions are attached as Appendix A to this Opinion.

with these people. It is not something that is uncommon for us. It is merely protecting our investment in whatever the contract covers whether it be this contract or the contract with some builder or someone that we are not normally familiar with. I want you to bear in mind up until a short period ago I had never seen any of these people and I know nothing about them. I take the same position in my business when I go out to let a contract or repair job or anything of that nature. If I don't know the people I feel like I need some protection and that was why I wanted this type of bond here.

"Q. Is that about what you told them? Did you tell them that?

"A. Yes, sir.

"Q. You told the union people that?

"A. I told them that in each meeting we had."

At the July 12 meeting, the parties reiterated their positions with respect to the three disputed clauses. Two subsequent meetings, in which the Federal Mediation and Conciliation Service participated, were held on July 31 and October 10. The Company did not change its position. Boone testified, however, that while he wanted the performance bond and the other two disputed provisions, he didn't say that they had to be in the contract. "I just wanted some protection in this contract. But as far as demanding, I never demanded anything at all." On the other hand, Shanklin testified that the positions of both parties remained the same, and Vicknair testified as to the final meeting of October 10:

"A. Before we were adjourned we were all called back together by Mr. Mapp [of the Federal Mediation and Conciliation Service]. We told the company that they would hear from us, meaning either for a meeting or something else and the company insisted at that time they must

have the Performance Bond, the Non-Observance of Picket Lines plus the No Strike-Lock Out Clause as suggested by the company. Then the meeting broke and I filed charges against the company.

"Q. All right. At any time, did the company ever make any overtures either relaxing or relinquishing their position concerning the Non-Observance of Picket Lines, No Strike No Lock Out Clause or the Performance Bond?

"A. None.

"Q. Did they insist they must have this as part of any contract that they would sign?

"A. Absolutely."

There was thus ample evidence to support the finding of the Trial Examiner and of the Board that as a condition to reaching any agreement the Company insisted upon the inclusion of the three disputed provisions.

2. *Performance Bond—The Law*

■ The law is settled that neither the Company nor the Union can lawfully condition willingness to enter into a contract upon the other party's consent to include some provision which is not a mandatory subject of bargaining. As clearly stated in NLRB v. Wooster Division of Borg-Warner Corp., 1958, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823:

"Read together, these provisions [sections 8(a) (5) and 8(d)] establish the obligation of the employer and the representative of its employees to bargain with each other in good faith with respect to 'wages, hours, and other terms and conditions of employment * * *.' The duty is limited to those subjects, and within that area neither party is legally obligated to yield. [National Labor [Relations] Board v. American [National] Insurance Co., 343 U.S. 395 [72 S.Ct. 824, 96 L.Ed. 1027]. As to other matters, how-

ever, each party is free to bargain or not to bargain, and to agree or not to agree.

"The company's good faith has met the requirements of the statute as to the subjects of mandatory bargaining. But that good faith does not license the employer to refuse to enter into agreements on the ground that they do not include some proposal which is not a mandatory subject of bargaining. We agree with the Board that such conduct is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining. This does not mean that bargaining is to be confined to the statutory subjects. Each of the two controversial clauses is lawful in itself. Each would be enforceable if agreed to by the unions. But it does not follow that, because the company may propose these clauses, it can lawfully insist upon them as a condition to any agreement."

■ The fact that agreement was not reached on other disputed clauses is not an answer, for the Company's "insistence" as a condition to reaching an agreement need not be the sole cause for failure to agree.[4]

The difficult part of the problem is to determine whether any particular proposal is a mandatory subject of bargaining within the statutory description of "wages, hours, and other terms and conditions of employment."[5]

■ The Trial Examiner thought that the no-strike, no-lockout and nonobservance of picket lines are mandatory subjects of bargaining, but noted that the record shows the Company entwined these proposals with the performance bond clause and that all three provisions were considered and discussed by the parties as a one-package proposition. The Board limited its adoption of the Trial Examiner's conclusion by stating: "Because of the other conditions with which they were entwined, we do not, as applied to this case, adopt the Trial Examiner's assertion that 'the no-strike, no-lockout and nonobservance of picket line [were] mandatory subjects of bargaining.'" Both the Trial Examiner and the Board held that a performance bond such as the Company proposed is not within the compass of the obligation to bargain with respect to "wages, hours, and other terms and conditions of employment," and that an employer's insistence upon such a provision as a condition to signing an agreement violates section 8(a) (5) of the Act.

The Company urges: "No United States Supreme Court decision has ever held that a performance bond to insure the faithful performance of a collective bargaining contract is a topic outside of the area of mandatory bargaining." That is true, but the Courts of Appeals and the Board[6] have uniformly and re-

---

4. Industrial Union of Marine & Shipbuilding Workers v. NLRB, 3 Cir. 1963, 320 F.2d 615, 618, cert. denied Bethlehem Steel Co. v. NLRB, 375 U.S. 984, 84 S. Ct. 516, 11 L.Ed.2d 472; Philip Carey Mfg. Co. v. NLRB, 6 Cir. 1964, 331 F.2d 720, 728.

5. Sections 8(a) (5) and 8(d) of the Act; Compare United Mine Workers of America v. Pennington, 85 S.Ct. 1585, 1607, decided June 7, 1965; and Local Union No. 189, Amalgamated Meat Cutters, and Butcher Workmen of North America, A.F.L.-C.I.O. v. Jewel Tea Co., 85 S.Ct. 1596, 1607, decided June 7, 1965. See also Annotation on "Subjects of Mandatory Collective Bargaining under Federal Labor Relations Act," 12 A.L.R.2d 265–280.

6. That "classification of bargaining subjects as 'terms or conditions of employment' is a matter concerning which the Board has special expertise". See opinion of Mr. Justice White in Local Union No. 189, Amalgamated Meat Cutters, and Butchers Workmen of North America, A.F.L.-C.I.O. v. Jewel Tea Co., 85 S.Ct. page 1600, cited supra n. 5. "Unquestionably the Board's demarcation of the bounds of the duty to bargain has great relevance * * *." United Mine Workers of America v. Pennington, 85 S.Ct. page 1590, cited supra n. 5. Footnote 18 of Mr. Justice Goldberg's dis-

peatedly indicated and held that a performance bond clause of the type here involved is not within the compass of mandatory collective bargaining.[7] We agree with those many decisions. The Company cannot insist to the point of impasse upon an agreement with any person (including a surety) other than the Union which is the exclusive bargaining representative for the employees. See NLRB v. Taormina, 5 Cir. 1953, 207 F.2d 251, 254. Other sound reasons support the uniform and repeated holdings.[8]

The Board properly concluded that the Company violated section 8(a) (5) and (1) of the Act by insisting as a condition to an agreement that the collective bargaining contract contain a performance bond provision.

### 3. Refusal to Re-employ Andrew Baylock, Jr.

■ Baylock had worked as a seasonal employee for the Company for "I would say about 16–17 years, off and on." Up to 1961 he had not filled out a written application. He testified that, " * * * it was '61 when they started having the boys fill out applications." In that year he gave his written application to Mr. Dupuy, the plant superintendent, and was employed. Baylock testified that the next year, 1962, before Labor Day, he saw "some trucks out there with cotton on it," and asked Eddie Stahl, the foreman, for a job. "Q. Tell us what conversation you had with Mr. Stahl? A. Well, I walked up to him and asked him if he was putting men back on. He said, 'No, they didn't have nothing to do.' Now, he told me, he said, 'Well, Homer Ford as [sic] able enough to hire you boys.' " [9]

Baylock left the plant and did not submit a written application for employment. The Trial Examiner held that the filing of an application would have been meaningless and Baylock was justified in accepting Stahl's decision as final, stating: "Baylock's undenied testimony shows that Stahl made it plain there was no job available for Baylock *because* of of his association with Ford, a well-known Union adherent." (Emphasis supplied.)

It appeared that applications for employment were required to be in writing, and that Plant Superintendent Dupuy had exclusive authority to decide whether to reemploy any applicant. There was no proof to sustain the Trial Examiner's exclusion that the unavailability of a job was *because* of Baylock's association with Ford. Baylock did not so testify on direct examination (see quotation supra).

senting opinion in those two cases also notes that " * * * decisions of the Labor Board as to what constitutes a subject of mandatory bargaining are, of course, very significant * * *."

7. Local 164, Brotherhood of Painters v. NLRB, 1961, 110 U.S.App.D.C. 294, 293 F.2d 133; International Brotherhood of Teamsters (Conway's Express), 87 N.L.R.B. 972, 978–79, aff'd on other grounds, sub nom.; Rabouin v. NLRB, 2 Cir. 1952, 195 F.2d 906; NLRB v. Davison, 4 Cir. 1963, 318 F.2d 550; NLRB v. Dalton Tel. Co., 5 Cir. 1951, 187 F.2d 811; NLRB v. Tower Hosiery Mills, Inc., 4 Cir. 1950, 180 F.2d 701; NLRB v. Taormina, 5 Cir. 1953, 207 F.2d 251; NLRB v. F. M. Reeves & Sons, Inc., 10 Cir. 1959, 273 F.2d 710; NLRB v. IBS Mfg. Co., 5 Cir. 1954, 210 F.2d 634, 639 (dissenting opinion); Jasper Blackburn Products Corp.; 21 N.L.R.B. 1240; Scripto Mfg.

Co., 36 N.L.R.B. 411; Interstate Steamship Co., 36 N.L.R.B. 1307; Dalton Telephone Co., 82 N.L.R.B. 1001; Standard Generator Service Co., 90 N.L.R.B. 790; Arlington Asphalt Co., 136 N.L.R.B. 742.

8. Many such reasons are set forth in Judge Sobeloff's opinion in NLRB v. Davison, 4 Cir. 1963, 318 F.2d 550, 556–557.

9. Homer Ford was a Union organizer. In another case against this same Company, an employee Sims had made written application in the fall of 1961 on the Company form to Plant Superintendent Dupuy, and was told, "You don't want to work for us if you are going to work for Homer Ford and the union." Under the circumstances of that case, we held that the refusal to re-hire Sims was an unfair labor practice. NLRB v. American Compress Warehouse, etc., 5 Cir. 1963, 321 F.2d 547, 549.

On cross-examination he repeated: "Q. What did you ask Eddie Stahl to do? A. I asked Mr. Eddie Stahl was he putting on any men back to work and he said, 'No.' He said he didn't have anything to do and he said Homer Ford, Jr. was able enough to hire you all boys and I turned around and walked off."

If no men were being put back to work, and there was no work for them to do, Stahl's reference to Homer Ford's ability to hire, though not called for and ill advised, was not sufficient basis for a conclusion that Baylock was discriminatorily refused reemployment. We therefore deny enforcement of the order to reinstate Baylock and make him whole for any loss of pay suffered. In other respects, the order of the Board will be enforced.

Enforced in part and denied in part.

### APPENDIX A.

Provisions Proposed by the Company.

"Both the Company and the Union agree to obtain and deliver to each other a performance bond written by a corporate surety company, payable to the other party in a penalty amount of .......... dollars in order to insure and guarantee the faithful performance of this contract by both parties.

"The Union agrees that the employees of the Company will cross any picket line put up around or near any of the Company's plants by any other union and will work in a normal way; the Union further agrees that the employees of the Company will not refuse to handle or work on any goods which may be claimed as unfair or hot by any union, including the union which is a party to this contract. The Union agrees to be responsible for the actions of the Company's employees, regardless of whether such actions are authorized by the Union. The failure of the Company's employees to abide by the provisions of this article shall constitute a violation by the Union of this contract.

"There shall be no strike, slow-down, work stoppage, interruption of work or any other activity on the part of the employees which causes a reduction in the normal amount of work or business of the Company. The Union shall be responsible for any such activities on the part of the employees, regardless of whether the Union has authorized the employees to engage in any such activities; it being intended that any such activities on the part of employees shall constitute a violation by the Union of this contract.

"There shall be no lock-out by the Company or any other activity on the part of the Company which produces the effect of a lock-out. The Company shall be responsible for any such activity on the part of any of its management or supervisory personnel, regardless of whether the Company has authoried such personnel to engage in such activities. Any such activities on the part of management personnel or supervisory personnel shall constitute a violation by the Company of this contract."