**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL HOD CARRIERS, BUILDING AND COMMON LABORERS UNION OF AMERICA, LOCAL NO. 1082 and its agent, George Tarr, Respondents.**

No. 20775.

United States Court of Appeals Ninth Circuit.

Sept. 29, 1967.

Certiorari Denied Jan. 29, 1968.

See 88 S.Ct. 853.

Ely, Circuit Judge, dissented.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Atty., N.L.R.B., Washington, D. C., Ralph E. Kennedy, Director, N.L.R.B., Los Angeles, Cal., for petitioner.

Lionel Richman, Richman, Garrett & Ansell, Jones & Jones, Los Angeles, Cal., for respondents.

Before CHAMBERS, BROWNING, and ELY, Circuit Judges.

PER CURIAM:

The Board held that the respondent union violated its duty to "confer in good faith with respect to wages, hours, and other conditions of employment * * *" imposed by section 8(b) (3) and 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(b) (3) and (d) when it refused to enter into a collective bargaining agreement unless that agreement contained a provision requiring the employer to post a performance bond.

The respondent first contends that the evidence does not support the Board's finding that the respondent insisted upon the posting of a performance bond. We think that the record considered as a whole contains substantial evidence to support the Board's finding. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The respondent next contends that the Board erred in concluding that bargaining for the performance bond clause did not constitute bargaining "with respect to wages, hours, and other terms and conditions of employment" within the meaning of section 8(d). See NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

The Board has uniformly held that bargaining for a performance bond does not fall within the meaning of section 8(d), and that, therefore, the par-

ties may not insist upon such a bond to impasse. These orders have uniformly been enforced, despite challenge. The cases are collected in NLRB v. American Compress Warehouse, 350 F.2d 365, 370 n.7 (5th Cir. 1965), and NLRB v. Davison, 318 F.2d 550, 555 n.14 (4th Cir. 1963). The basic reason for these rulings was expressed in Excello Dry Wall Co., 145 N.L.R.B. 663, 664 (1963): "The statutory obligation to bargain is not limited and cannot be limited to financially responsible parties, whether employer or labor union."

In the present case the Board did not hold all performance bond clauses to be nonmandatory subjects of bargaining. Respondent had argued to the trial examiner that the performance bond it had sought was different from those involved in the Board's earlier decisions because it was to be a cash bond (rather than a surety bond), and because it was to be conditioned solely upon payment by each employer of the wages and other benefits due its employees. The trial examiner expressly reserved the question of whether such a performance bond clause would have been a mandatory subject of bargaining. He pointed out that the clause involved in this case would have required the contracting employer to pay liquidated damages and to guarantee payment of wages and fringe benefits due the employees of subcontractors of the contracting employer. The trial examiner held: "a contract which includes an obligation to pay wages of another employer's employees or to pay damages for nonperformance of an employer's obligation * * * would be a nonmandatory subject of bargaining." International Hod Carriers, Local 1082, 150 N.L.R.B. 158, 178 (1964). The Board adopted this conclusion.

■ "Obviously, classification of bargaining subjects as 'terms or conditions of employment' is a matter concerning which the Board has special expertise." Local Union No. 189, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO v. Jewel Tea, 381 U.S. 676, 685–86, 85 S.Ct. 1596, 1600, 14 L.Ed.2d 640 (1965) (opinion of Justice White). We are not convinced that the Board erred in the exercise of that expertise here.

The order of the Board will be enforced.

ELY, Circuit Judge (dissenting):

I respectfully dissent. I expressed my views in a proposed opinion in which my Brothers, after very careful and conscientious consideration, refused to concur. It reads as follows:

The National Labor Relations Board petitions for enforcement of an order which directs the respondent union to cease and desist from engaging in conduct found to constitute an unfair labor practice and to take certain affirmative action. Our jurisdiction is supplied by section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e). The decision of the Board is reported at 150 N.L.R.B. 158 (1964).

For two years prior to May 31, 1962, E. L. Boggs, a plastering contractor, had been party to an agreement with one of the respondent's sister locals. When that agreement expired, Boggs joined the Progressive Plastering & Lathing Contractors' Association, an organization which was formed to provide collective bargaining representation for its members. In June, 1962, a representative of the respondent union appeared at Boggs' jobsite and delivered a copy of a proposed contract to Boggs' foreman. The foreman delivered the contract to Boggs, in compliance with the union representative's instructions, but Boggs refused to sign it. Shortly thereafter, the Association, acting for Boggs and its other members, entered into negotiations for a new contract with the Southern California District Council of Laborers, of which respondent was a member. No agreement was reached. The reason for the failure of these negotiations, and the reason for Boggs' unwillingness to sign the contract which had been offered to him earlier, was the union's insistence that it would not agree to a contract which did not con-

tain a provision for a performance bond. During the period of the negotiations between the Association and the District Council, one Tarr, the respondent local's business representative, approached Boggs and, attempting to persuade him to sign a contract containing a performance bond clause,[1] threatened a work stoppage.

1. The provision, in it entirety, reads:

### ARTICLE X
### BOND

A. A cash bond in the amount of One Thousand Dollars ($1,000) shall be deposited by the individual Contractor with the Joint Conference Board, or a trustee designated by the Joint Conference Board. Said bond shall be liable for any assessment for wages, vacation payments, liquidated damages as provided for in this Agreement, and/or contributions for medical, hospital, welfare and life insurance plans, pension plan, and for employee benefits as provided for in this Agreement, as directed by the Joint Conference Board after hearing and vote as provided for in this Contract.

B. In lieu of the individual bond hereinabove provided, the Contracting Plasterers Association of Southern California, Inc. may furnish a cash bond in the amount of Twenty Thousand Dollars ($20,000) and the Orange County Lathing and Plastering Contractors Association, Inc. may furnish a cash bond in the amount of Ten Thousand Dollars ($10,000) each bond to be liable as hereinabove provided for any and all of their members respectively in good standing. Said Associations' bonds in the amount above set forth shall in no event be liable for any contractor member of either of said Associations covered by said bonds in excess of One Thousand Dollars ($1,000).

C. The Contracting Plasterers Association of Southern California, Inc. and any other association authorized hereunder to post a bond on behalf of its members with the Joint Conference Board shall provide a list of all of its members who are covered by said bond to each of the seven (7) Locals signatory hereto and to the Joint Conference Board. Any changes in membership, either by additions to or by withdrawals from, shall immediately be communicated to the seven (7) Locals and the Joint Conference Board.

D. The bond of the individual contractor and the bonds of the Contracting Plasterers Association of Southern California, Inc. and the Orange County Lathing and Plastering Contractors Association, Inc. shall at all times be maintained in the full amount hereinabove set forth.

E. In addition to the bond herein required, the individual contractors shall file with the Union their social security and unemployment account numbers and certificate of compensation insurance.

F. The Joint Conference Board shall have the right to hear and determine and levy on all bonds in all matters concerning this Agreement in the manner provided for in Article XIII hereof.

G. The Joint Conference Board shall not be required to assess any bond for the payment of wages that are due and payable to an employee under the terms of this Contract for any period prior to twenty-one (21) days immediately preceding the submission of said claim for unpaid wages to the Joint Conference Board.

H. The terms and conditions of the bond as provided by this Article shall be as follows: Cash Bond. A cash bond shall be deposited with the Joint Conference Board or a trustee designated by the Joint Conference Board, said bond to be subject to any assessment for wages, vacation payments, liquidated damages as provided for in this Agreement, and medical, hospital, welfare and life insurance plans, pension plan, and for employee benefits as provided for in this Agreement, as directed by the Joint Conference Board after hearing and vote as provided for in this Agreement.

1. Said bond principal once deposited shall be refunded when this Agreement has been terminated, or upon application to the Joint Conference Board after satisfactory proof that the Contractor is no longer contracting within the jurisdiction of any Local Union signatory hereto.

2. Upon application and satisfactory proof to the Joint Conference Board, the principal of the bonds shall be refunded at the end of the yearly quarter.

3. No bond shall be required to be refunded sooner than sixty (60) days after application to the Joint Conference Board.

4. The Joint Conference Board or trustee designated by the Joint Conference Board shall have the authority to deposit all or any part of said funds so received in a savings or commercial bank account together with funds received from other Contractors or the Joint Conference Board, or trustee designated by the Joint Conference Board, shall have the authority to invest not more than seventy-five per cent (75%) of said funds together with funds received from other contractors in United States Government

When Boggs persisted in his refusal, Tarr carried out the threat and set up a picket line around the jobsite. Boggs then agreed to sign the contract upon the understanding that he might give a certified check to satisfy the bond provision and that the check would be held, uncashed, pending an agreement between the Association and the District Council for a blanket bond covering all the Association's members. After Boggs signed the contract and delivered the check, the picket line was removed.

The Board held that the respondent's insistence upon a performance bond clause, as evidenced by its position at the bargaining table and by its subsequent picketing to obtain such a clause, violated section 8(b)(3) of the National Labor Relations Act, 29 U.S.C. § 158(b)(3) The order requires that the respondent cease and desist from its insistence upon the inclusion of a performance bond clause in its contract with Boggs or upon Boggs' compliance therewith and that it return to Boggs the certified check which he had delivered to Tarr. The order further requires that if the check has been cashed the respondent shall repay its face amount, together with interest from the date of cashing. Respondent contends that the determination that its conduct violated section 8(b)(3) was erroneous.[2]

Section 8(b)(3) of the act imposes upon a labor organization and its agents the duty to bargain collectively with the employer.[3] Section 8(d), which defines that duty, requires that the employer and the representatives of the employees "confer in good faith with respect to *wages, hours, and other terms and conditions of employment * * *.*" (Emphasis supplied.) While collective bargaining need not be confined to the italicized subjects, called "mandatory subjects," the refusal to enter into an agreement on the ground that it does not

---

Bonds, certificates of deposits, insured savings and loan associations or such investments approved for trust funds.

5. The Joint Conference Board or the trustee, as the case may be, shall collect all income received by reason of interest or otherwise derived from the investment or deposit of said funds.

6. The income shall be disposed of as follows:

    a. Payment of all expenses for administration of said fund.

    b. Payment of taxes of all kinds.

    c. Any balance of income shall be paid to the Pension Trust.

7. The depositing contractor or Association shall bear the tax assessments on capital gains on his proportion of said fund, if any, and shall also pay any other taxes levied on his proportionate share of said fund, if any.

8. A valuation of the principal fund shall be made quarterly to determine gain or loss affecting the contractor's deposit.

9. The trustee, if acting at the designation of the Joint Conference Board, shall disburse the principal or any portion thereof at the direction of the Joint Conference Board, and in order to pay any contractor's obligations as hereunder stated, said disbursements by the Joint Conference Board shall be made in the amounts and to the payee as directed.

10. The refund of the contractor's deposit upon direction of the Joint Conference Board shall be less any authorized principal disbursements, after which the balance would be revalued according to the profit or loss indicated by valuation of the principal fund.

11. All income, after payment of expenses, fees and taxes shall be distributed to the Pension Trust annually and at the termination of this Agreement. Said income be distributed to the Pension Trust even though by revaluation of the fund there has been determined to be a capital loss. That is to say, the income under no circumstances shall be used to reduce any capital losses or for the purpose of paying any portion of disbursements for wages, welfare, or any levy directed by the Joint Conference Board.

2. Additionally, respondent asserts that since the check was issued to provide security to several labor unions jointly, the order against the respondent alone, where the other beneficiaries of the security arrangement were not joined as parties respondent, is inappropriate. We do not reach this contention.

3. Section 8(a)(5), 29 U.S.C. § 158(a)(5), imposes the reciprocal duty to bargain upon the employer.

include some proposal which is not one of the "mandatory" subjects of bargaining constitutes a violation of the duty to bargain collectively. National Labor Relations Board v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). It was only by application of this rule that the Board determined that respondent had committed an unfair labor practice. The Board expressly rejected a finding by the Trial Examiner that the respondent had been guilty of a general refusal to bargain in good faith by adopting a "take it or leave it" attitude. 150 N.L.R.B. at 161–163.

Respondent's main contention here is that the performance bond provision falls within the range of mandatory bargaining subjects and that, therefore, insistence therefor is not improper. It also urges that, even if the subject is nonmandatory, its insistence upon the clause was not of such a nature as to justify application of the rule of *Wooster Division of Borg-Warner*. Agreement was not prevented by its demand for a performance bond, respondent argues, but by the inability of the parties to agree on several proposals, some clearly within the area of mandatory bargaining. We have examined the record. It fully supports the Board's determination that the failure of negotiations resulted from respondent's insistence upon a contractual provision for a performance bond. Our decision must turn on whether respondent's particular performance bond proposal was a subject included within the language, "wages, hours, and other terms and conditions of employment." If not, the finding of unfair labor practice must be upheld.

Petitioner contends that the status of performance bonds as nonmandatory

subjects is settled, and, indeed, the assertion has been made by the courts. See, e. g., N.L.R.B. v. Davison, 318 F.2d 550, 555 (4th Cir. 1963). We have discovered only one decision, however, in which such a broad statement of the proposition was necessary to the result which was reached. In Carpenters' District Council of Detroit, 145 N.L.R.B. 663 (1963), enforced, 58 L.R.R.M. 2064 (D.C. Cir. 1964), the Board held that "insistence upon any performance bond * * is *per se* an unlawful refusal to bargain." 145 N.L.R.B. at 667. With the exception of that case, the decisions cited by petitioner in support of its position are distinguishable from the matter at bar. Jasper Blackburn Products Corporation, 21 N.L.R.B. 1240 (1940), the progenitor of the line of authority upon which petitioner relies, declared that the employer, by insisting upon a performance bond, had refused to bargain in good faith. In that case, however, the underlying reason for the decision was the determination that the purpose of the employer's insistence for the bond was to thwart agreement generally.[4] Offering a proposal with such intention and purpose, regardless of the mandatory or non-mandatory nature of the subject matter of the proposal, constitutes an unfair labor practice. See N.L.R.B. v. Herman Sausage Co., 275 F.2d 229 (5th Cir. 1960). As to the performance bond itself in *Jasper Blackburn*, the only characteristic which the Board found objectionable was that the employer was enabled, as a condition to agreement, to require, in effect, that the union "pay a tax to a surety company * * *." 21 N.L.R.B. at 1254. That particular objection is inapposite in the instant case,[5] as a cash bond was accepted. *Jasper Blackburn* did *not* hold that a performance bond clause does not relate

---

4. "Since the respondent had in 1937 stated its intention not to sign any agreement, and since none of the proposals advanced either by the respondent, or by the Union, called for any performance whatsoever on the Union's part, it would seem clear that the primary purpose of the respondent's demand for a bond was to avoid

the required fundamentals of collective bargaining." · 21 N.L.R.B. at 1254–55.

5. Also inapplicable to the instant case, and for the same reason, is the rationale of N.L.R.B. v. American Compress Warehouse, Div. of Frost-Whited Co., 350 F. 2d 365 (5th Cir. 1965), cert. denied, 382 U.S. 982, 86 S.Ct. 558, 15 L.Ed.2d 472

to "wages, hours, and other terms and conditions of employment."

The decisions in N.L.R.B. v. Davison, supra, and Local 164, Brotherhood of Painters v. N.L.R.B., 110 U.S.App.D.C. 294, 293 F.2d 133, cert. denied, 368 U.S. 824, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961), which declared performance bonds to be non-mandatory subjects, appear to us to have derived from the scope of the particular bonds involved in those cases. The proposal in *Davison* was held non-mandatory because it "related to security for the contracting party * * * *rather than relating to a benefit or security for the employees.*" 318 F.2d at 556. (Emphasis supplied.) In *Local 164* the union's proposed bond was payable "to the union in the event * * * *that said contractor has committed any substantial breach of this agreement or* has failed to comply with any of the terms or conditions of employment specified thereunder." (Emphasis supplied.) This language, noted the court, indicated that the union itself, in drafting the particular bond provision, recognized that the coverage was to extend beyond "terms and conditions of employment." 293 F.2d at 135. Neither of the objections presented by the facts of these two cases can here be seen. Our examination of the foregoing authorities leads us to the conclusion that there must be case by case determination of whether a particular performance bond proposal is to be classified as mandatory or as non-mandatory.

Here there is no suggestion that the proposed provision is unlawful, or that, if agreed to by the employer, it would be unenforceable. As we have previously emphasized, the Board expressly overturned the Examiner's determination that the respondent had not bargained in good faith.

Resolution of the crucial issue, whether the subject of a performance bond falls sufficiently within the range of the relevant statutory language and is, therefore, a mandatory subject which may be disputed to impasse without engagement in unfair labor practice, should depend upon the nature and scope of the bond involved in a given case.[6] The bond here demanded by the respondent union, chargeable only for the payment of wages and fringe benefits which are conceded to be within the range of the mandatory subjects,[7] was clearly intended to insure that those payments would continue to flow without interruption. Its function binds it so closely to those payments that

---

(1966), cited by petitioner. The court wrote,

"The Company cannot insist to the point of impasse upon an agreement with any person (*including a surety*) other than the Union which is the exclusive bargaining representative for the employees." 350 F.2d at 370. (Emphasis supplied.)

6. This approach harmonizes with the Supreme Court's view, expressed in *Wooster Division of Borg-Warner*, that, even as to non-mandatory subjects of bargaining, "each party is free to bargain or not to bargain, and to agree or not to agree." 356 U.S. at 349, 78 S.Ct. at 722. This broadly expressed freedom, however, may be illusory. A proposal on a non-mandatory subject may be offered, of course. If it is rejected, must not the offeror withdraw it, lest his insistence be construed as a refusal to bargain in good faith? See Duvin, The Duty to Bargain: Law in Search of Policy, 64 Colum.L.Rev. 248, 271–273 (1964); Feinsinger, The

National Labor Relations Act and Collective Bargaining, 57 Mich.L.Rev. 807, 826–830 (1959).

7. In his Intermediate Report to the Board in the instant case, the Trial Examiner, while recognizing the significance of the scope of the bond, was disturbed by the provision that the bond should be chargeable for "liquidated damages." 150 N.L.R.B. at 178. These "damages," provided for in paragraph (D) (1) of Article V of the contract, are assessed for failure to make timely payment into certain employee fringe benefit funds. They are payable to the particular funds. In effect, then, the bond provides an alternative mode of payment to funds conceded to be within the range of mandatory bargaining subjects. This aspect of the performance bond does not, therefore, compel a determination that it is not a subject included by the statutory language, "wages, hours, and other terms and conditions of employment."

the bond can clearly and fairly be seen to relate, as do the payments themselves, to "wages, hours, and other terms and conditions of employment." Such a bond, not claimed to be unreasonably excessive, [8] may be insisted upon, even to impasse, if the insistence is in good faith.

We hold that the record, devoid of determination that the respondent's demand was intended to prevent agreement, or was otherwise indicative of actual bad faith in bargaining, does not support the conclusion that an unfair labor practice was committed.

---

**8.** We agree with the Board that public policy in favor of the collective bargaining process, reflected in the National Labor Relations Act, would not permit such demands for performance bonds as would significantly favor "financially responsible parties." See Carpenters' District Council of Detroit, supra, 145 N.L. R.B. at 664. A finding of general refusal to bargain in good faith might be inferred, quite properly, from a party's insistent proposal for a bond excessive in amount or containing unreasonable terms or terms not clearly related to "wages, hours, and other terms and conditions of employment."