NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 264, LABORERS' INTERNA-
TIONAL UNION OF NORTH
AMERICA, Respondent.

No. 75-1259.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 10, 1975.

Decided Jan. 22, 1976.

Paul J. Spielberg, Atty., N.L.R.B., Washington, D. C., for petitioner; Peter G. Nash, Gen. Counsel, John C. Miller, Acting Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Grant Morris, Atty., N.L.R.B., Washington, D. C., on brief.

Charles A. Werner, St. Louis, Mo., for respondent.

James G. Baker, Kansas City, Mo., for intervenor, Missouri Builders' Association of Kansas City.

Before GIBSON, Chief Judge, and LAY and STEPHENSON, Circuit Judges.

GIBSON, Chief Judge.

The National Labor Relations Board petitions for enforcement of its order reported at 216 N.L.R.B. No. 4 (1975) requiring respondent, Local 264, Laborers' International Union of North America, to cease and desist from engaging in certain unfair labor practices and to take other affirmative action. The Board found that the Union had violated § 8(b)(1)(B) and § 8(b)(3) of the National Labor Relations Act (NLRA)[1] by forcing D & G Construction Co. (the Company) to become a signatory to a multi-employer collective bargaining agreement containing nonmandatory subjects of bargaining.

The Company, a concrete subcontractor, had been engaged to work on the Willow Creek Construction Project in Kansas City, Missouri. This project involved the construction of an apartment complex by Price Brothers Mortgage Company, the general contractor. At the time construction was undertaken, Price Brothers was a signatory to a multi-employer collective bargaining agreement which had been negotiated and executed by the Union and the Builders Association of Kansas City, an organiza-

---

1. 29 U.S.C. § 151 et seq. (1970), as amended, Act of July 26, 1974, Pub.L. No. 93–360, 88 Stat. 395. Sections 8(b)(1)(B) and 8(b)(3), 29 U.S.C. §§ 158(b)(1)(B), 158(b)(3) provide:

(b) It shall be an unfair labor practice for a labor organization or its agents—
(1) to restrain or coerce * * * (B) an employer in the selection of his representa- tives for the purposes of collective bargaining or the adjustment of grievances;

\* \* \* \* \* \*

(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title * * *.

tion representing construction firms in the area. As signatory, Price Brothers was bound by the agreement, including the provision requiring subcontractors on its jobsite to become signatories to the collective bargaining agreement. When the Company commenced work on Price Brothers' project, it had not become a party to the agreement.

On October 16, 1973, the Company employed four members of the Union as laborers at the construction site. Columbus Sumpter, field representative for the Union, requested a partner in the Company, Joseph Dalton, to sign a stipulation binding the Company to the collective bargaining agreement. Since Sumpter did not have a copy of the agreement in his possession at that time, he agreed to meet with Dalton the following day to further discuss the agreement.

On October 17, Sumpter met with Dalton and representatives of Price Brothers to encourage Dalton to sign the stipulation presented by the Union. Dalton had discussed the agreement with his attorney and voiced objections to three provisions contained in it. First, the contract required a contribution of one cent for each employee hour of work into a Laborers Administrative Expense Account. This account was to be used to defray management's cost of administering employees' fringe benefit programs and maintaining records required by the agreement. Second, a signatory was required to pay two cents for each employee hour of work into a Laborers Industry Advancement Fund. This fund was to supply financial support to programs aimed at training employees and improving conditions in the construction industry as a whole. Third, a deposit of $1,000 was required to be paid into a Laborers Security Account to guarantee "payment of wages and fringe benefit contributions * * *" under the agreement.

Despite Dalton's objections, the Union remained adamant in its demands that the stipulation be signed "as is" except for a reduction in the performance deposit to $500; otherwise the construction site would be picketed. Price Brothers, of course, not wanting the project "shut down", informed the Company that it would either have to sign the stipulation or be fired from the job. Dalton then signed the stipulation under protest. The Company thereafter filed a § 8(b)(1)(B) and § 8(b)(3) unfair labor practice charge against the Union. The Board found adequate evidence to support these allegations, issued a cease and desist order against the Union and ordered the Union to reimburse the Company for all contributions made to the accounts.

## I. Timeliness of Filing the Charges.

The preliminary issue raised on this appeal is whether the Company's charge was filed with the Board and served upon the Union within six months of the occurrence of the unfair labor practices as required by § 10(b) of the NLRA.[2] The activities which gave rise to the unfair labor practices occurred on October 17, 1973. The charge was filed with the Board on April 16, 1974, and was sent to the Union by registered mail[3] on April 17. The charge was re-

2. Section 10(b), 29 U.S.C. § 160(b), provides in relevant part:

(b) Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: Provided,

That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *.

3. There is no dispute between the parties that registered mail is a proper means of serving charges upon the respondent. Section 11(4), 29 U.S.C. § 161(4), provides in relevant part:

(4) Complaints, orders, and other process and papers of the Board, its member, agent, or agency, may be served either personally

ceived by the Union on April 18. The statute is clear in providing that a charge must not only be filed, it must also be served within the prescribed six month period. *Old Colony Box Co.,* 81 N.L.R.B. 1025, 1027 (1949). It is conceded by the parties that the six month period in this case expired on April 17. We are therefore confronted with an issue of first impression in the federal courts—is service pursuant to § 10(b) effective upon mailing the charge by registered mail or is actual receipt of the charge by the respondent necessary.

The Union and the Intervenor, Builders Association of Kansas City, contend that the purpose of the "service" provision is to impart "actual notice" to the respondent. Therefore, it is alleged that the date of service is the date the charges are received by the respondent. This approach would obviously compel a dismissal of the charge in the present case as being untimely served.

The Board alleges that service is effective on the date the charge is mailed to the respondent. Its support for this proposition is derived primarily from its own rules of practice which provide that "[t]he date of service shall be the day when the matter served is deposited in the United States mail or is delivered in person, as the case may be." 29 C.F.R. § 102.113(a) (1975). Although the Board initially deferred ruling on the issue of whether service was effective on the date of mailing or date of receipt, *Luzerne Hide and Tallow Co.,* 89 N.L.R.B. 989, 990 (1950), it has recently committed itself in adjudicatory proceedings to the principle that service is effective upon mailing as embodied in § 102.113(a) of its rules of practice. *Dow Chemical Co.,* 215 N.L.R.B. No. 139 (1974). The central point of dispute between the parties is whether § 102.113(a) is valid and is to be given effect.

The Board is vested with authority to promulgate rules and regulations which "may be necessary to carry out the provisions of [the NLRA]." 29 U.S.C. § 156. When a party assumes the burden of attempting to nullify a Board rule, he must illustrate that the rule fails to comport with the statutory language and congressional policy of the NLRA. *See Wallace Corp. v. N.L.R.B.,* 323 U.S. 248, 254–55, 65 S.Ct. 238, 89 L.Ed. 216 (1944); *N.L.R.B. v. May Department Stores Co.,* 154 F.2d 533, 536 (8th Cir.), *cert. denied,* 329 U.S. 725, 67 S.Ct. 72, 91 L.Ed. 627 (1946). The Board's broad discretion to establish procedures and safeguards is not to be disturbed unless a rule instituted pursuant to this authority is shown to be "without justification in law or in reason." *N.L.R.B. v. A. J. Tower Co.,* 329 U.S. 324, 332, 67 S.Ct. 324, 329, 91 L.Ed. 322 (1946). We review the rule in question, in light of the clear and implicit intendment of the statutory provisions, and assess whether the Board's action in promulgating the rule extended beyond the parameters of permissible administrative latitude.

The legislative history of § 10(b) is relatively unenlightening on the issue of when service is effective. The NLRA, popularly characterized as the Wagner Act, was approved by Congress in 1935. Act of July 5, 1935, ch. 372, 49 Stat. 449. The Wagner Act created the National Labor Relations Board and § 10(b) of the Act empowered the Board to issue complaints and conduct hearings upon receiving a charge that a person had committed an unfair labor practice. The major infirmity in this particular provision of the Act was its failure to specify a time limitation within which a charge must be filed. Consequently, inordinate delays between the occurrence of an unfair labor practice and the filing of the

---

or by registered mail or by telegraph or by leaving a copy thereof at the principal office or place of business of the person required to be served.
A charge has been held to fit into the category of "other papers" of the Board for purposes of

§ 11(4). *N.L.R.B. v. Wiltse,* 188 F.2d 917, 926 (6th Cir.), *cert. denied sub nom. Ann Arbor Press, Inc. v. N.L.R.B.,* 342 U.S. 859, 72 S.Ct. 87, 96 L.Ed. 647 (1951); *see* 29 C.F.R. § 102.-111 (1975).

charge were often condoned. *Phelps Dodge Corp. v. N.L.R.B.,* 113 F.2d 202, 206 (2d Cir. 1940), *modified on other grounds,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). This procedural deficiency was recognized and corrected by Congress with the passage in 1947 of the Taft-Hartley Act. Act of June 23, 1947, ch. 120, 61 Stat. 136. Section 10(b) of the Wagner Act was amended to add the following proviso:

> *Provided,* That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *.

This amendment was deemed necessary by Congress due to the realization that, as a practical matter, "[t]here must be a limitation as to time" in filing unfair labor practice charges. 93 Cong.Rec. 4411 (1947) (remarks of Senator Smith). The six month statute of limitation is intended "to bar litigation over past events 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused.'" *Local 1424, International Association of Machinists v. N.L.R.B.,* 362 U.S. 411, 419, 80 S.Ct. 822, 828, 4 L.Ed.2d 832, 839 (1960), *quoting* H.R.Rep.No.245, 80th Cong., 1st Sess. 40 (1947); *accord, N.L.R.B. v. Colonial Press, Inc.,* 509 F.2d 850, 854 (8th Cir.), *cert. denied,* 423 U.S. 833, 96 S.Ct. 56, 46 L.Ed.2d 51 (1975).

■■■ The six month limitation applies only to the filing of the charge, not to the issuance of the complaint by the General Counsel.[4] The charge only serves the purpose of setting in motion the investigative processes of the Board. *N.L.R.B. v. Fant Milling Co.,* 360 U.S. 301, 307, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959). After the charge is filed, the respondent is usually contacted a number of times before formal proceedings are initiated with the issuance of the complaint. The charging party is vested with primary responsibility for serving the charge upon the respondent. However, the Board also serves the respondent as a matter of course. 29 C.F.R. §§ 101.4, 102.14 (1975). After filing and service of the charge, the Board initiates its investigation and will generally notify the respondent and ask him to express his position regarding the allegations in the charge. 29 C.F.R. § 101.4. If the Board finds that the charge has merit, informal conferences between the charging party and respondent are generally conducted to seek a compromise or settlement. 29 C.F.R. § 101.7 (1975). It is only after these informal means have failed to resolve the unfair labor practice charge that the General Counsel may decide to initiate more formal adjudicatory proceedings with the issuance of a complaint.

■■■ Although limitation questions involving one or a few days invariably pose difficult decisions that bring into focus competing equitable and legal principles, we think that the Board's rule prescribing the date of mailing as the date of service is a valid and reasonable exercise of the Board's authority to promulgate rules to implement the NLRA. The rule is at least a permissible interpretation for the Board to make in adopting uniform procedures for the proper and fair administration of the Act. From the foregoing it is clear that the respondent will not be prejudiced if the charge is actually received by it a short period of time after the six month period expires. There is no deprivation of any rights since the filing and service of the charge are followed only by informal investigative and settlement procedures. The respondent is afforded several opportunities to be notified immediately after the charges are filed against

---

4. The House of Representatives attempted to insert a provision in the Taft-Hartley Act which would have required the issuance of the complaint within six months of the filing of the charge. This provision was eliminated in the Conference Committee Report. H.R.Rep. No.510, 80th Cong., 1st Sess. 53 (1947), *reprinted in* U.S.Code Cong.Serv. 1135, 1159 (1947).

him. Therefore, no prejudice to the respondent inheres in the procedure adopted by the Board.

■ A rule designating that service is effective on the date of mailing permits the charging party and the Board to effectively control the time and means of service and to gain some assurance that the charge has been actually served within the six month period. Imposing a requirement that the date of receipt constitutes the date of service would create difficulties of proof and would leave service to the vicissitudes and uncertainty of mail service. Obvious and egregious unfair labor practices may go unremedied merely because a charge is rendered untimely due to a minimal and unanticipated delay in the delivery of the charge to the respondent. The establishment of such a requirement might impede access to the machinery of the NLRA since the Board is powerless to remedy unfair labor practices unless a timely charge is filed and served. Restricting access to the Board results in a substantial interference with the broad and remedial purposes of the NLRA. See *N.L.R.B. v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 424, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); *Nash v. Florida Industrial Commission*, 389 U.S. 235, 238, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967). In the absence of an explicit statutory provision as to when service is effective, the Board may prescribe any rule which is consistent with the statutory purpose and is suffi-

cient to give all parties a fair hearing. See *Wallace Corp. v. N.L.R.B.*, 323 U.S. 248, 254–55, 65 S.Ct. 238, 89 L.Ed. 216 (1944); *General Motors Corp. v. N.L.R. B.*, 222 F.2d 349, 351 (5th Cir. 1955). Section 102.113(a) satisfies both of these requirements.[5]

The procedural rule adopted by the Board in § 102.113(a) is not novel or unique since it has been explicitly sanctioned in a number of other contexts. Fed.R.Civ.P. 5(b) provides that "[s]ervice by mail is complete upon mailing." *Frierson v. McIntyre*, 151 F.Supp. 5 (W.D. Va.1953). Congress has incorporated this rule into various statutory schemes. 15 U.S.C. § 1312(e)(3) (1970) (Antitrust Civil Process); 49 U.S.C. § 1485(c) (1970) (Federal Aviation Program). Moreover, a number of administrative agencies have adopted rules which specify that the date of mailing will constitute the date of service.[6]

■ Conceptually, the Board's ruling is in harmony with the practice of many states which provides for the tolling of a statute of limitations by the filing of a suit, the issuance of a summons and delivery of the summons to the proper official with directions for service. *E. g.*, Ark.Stat.Ann. § 27–301 (1962). *See generally* Annot., 28 A.L.R.2d 236, 243, 258–67 (1953). Iowa, which formerly had adopted the rule that civil actions are commenced only when process is served upon the defendant, Iowa R.Civ.P. 48,[7] had followed the same rationale by per-

---

**5.** The Union and Intervenor rely upon *N.L.R.B. v. Friedman-Harry Marks Clothing Co.*, 83 F.2d 731 (2d Cir. 1936), for the proposition that service denotes actual receipt. *Friedman* involved a Board's attempt to enforce an order before it was actually received by the respondent. In discussing the applicable statutory provisions, the court equated "service" of the order with "actual receipt." *Friedman* antedated the Taft-Hartley Act and the court had no occasion to consider the service requirement in the context of the six month limitation for the filing and service of charges. Furthermore, there was no Board rule in *Friedman* to support the Board's position; thus the deference accorded official rules of the Board was not involved in that case. However, we do note that certain broad and categorical lan-

guage in *Friedman* is inconsistent with our holding here and to the extent that the cases are irreconcilable, we decline to adopt the rationale of *Friedman*.

**6.** *E. g.*, Civil Aeronautics Board, 14 C.F.R. § 302.8(f) (1975); Federal Power Commission, 18 C.F.R. § 1.17(d) (1975); Federal Maritime Commission, 46 C.F.R. § 502.116 (1974); Federal Communications Commission, 47 C.F.R. § 1.47(f) (1974).

**7.** The Iowa procedure for commencing actions and tolling statutes of limitations was modified by order of the Supreme Court of Iowa on January 15, 1975. Rule 48 now provides that actions are commenced by filing the petition with the court.

mitting the mere delivery of the summons to the serving officer to toll the statute even though actual service had not been consummated before the expiration of the limitation period. Iowa R.Civ.P. 49; see N.D.R.Civ.P. 3; N.D. Cent.Code Ann. § 28–01–38 (1974). See generally Annot., 29 A.L.R.2d 236, 299–304 (1953). It is clear that the drafters of § 10(b) of the NLRA intended the six month provision to be a statute of limitations and not a restriction on the jurisdictional powers of the Board. *A. H. Belo Corp. v. N.L.R.B.*, 411 F.2d 959, 966 (5th Cir. 1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970). It therefore appears reasonable and permissible for the Board to conclude that the mailing of the charge to the respondent constitutes service at least for the purpose of tolling the statute of limitations.

We conclude that the charge was timely served under the Board's rules and that this action is not barred by the six month statute of limitations. We now consider the Union's other assignments of error.

## II. *Unfair Labor Practices.*

The Union argues that the § 8(b)(3) violation cannot be maintained on the basis of the present record, because the objectionable provisions in the collective bargaining agreement were mandatory subjects of bargaining, thus leaving the Union free to bargain to an impasse [8] and threaten to picket without incurring the sanctions of an unfair labor practice.

Section 8(d) of the NLRA, 29 U.S.C. § 158(d), establishes a mutual obligation on employers and unions to bargain in good faith on all matters relating to "wages, hours, and other terms and conditions of employment * * *." A provision not relating to any of these particular matters is considered a nonmandatory subject of bargaining and the parties may bargain with respect to that provision if they choose. However, no party may insist upon the inclusion of a nonmandatory provision in the collective bargaining agreement as a precondition to signing the agreement. Provisions which purportedly affect terms and conditions of employment are mandatory subjects of bargaining only if they encompass some aspect of the employer-employee relationship and do not relate solely to the internal procedures of the employer or the union. *N.L.R.B. v. Borg-Warner Corp.*, 356 U.S. 342, 349–50, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

The Union asserts that the provision requiring contributions of one cent per hour into the Laborers Administrative Expense Account was a mandatory subject of bargaining. The collective bargaining agreement specified that the fund was to be used as follows:

The purpose of this ONE CENT (1¢) contribution is to assist the Association in partially defraying its costs of furnishing the management's share in the establishment, administration and en-

8. Intervenor contends that there was no showing that the Union and the Company bargained to an impasse and that the Union could therefore threaten to picket without incurring a § 8(b)(3) violation. However, the record clearly shows that an impasse was reached. When the Union requested the Company to sign the stipulation, the Company objected to three provisions in the collective bargaining agreement. The Union agreed to reduce the performance deposit from $1,000 to $500, but refused to modify or remove the remaining objectionable provisions. The Company then requested more time to consider the proposal. The Union representative stated that the stipulation would have to be signed immediately or

the construction site would be picketed. The Company thereafter signed the agreement under protest. It is clear that the parties were deadlocked on the issue of whether the objectionable provisions would be included in or deleted from the agreement. The circumstances surrounding the bargaining manifest the fact that an impasse existed. *N.L.R.B. v. Big Three Industries, Inc.*, 497 F.2d 43, 48 (5th Cir. 1974); *Newspaper Drivers & Handlers' Local 372 v. N.L.R.B.*, 404 F.2d 1159, 1160 (6th Cir. 1968), cert. denied, 395 U.S. 923, 89 S.Ct. 1775, 23 L.Ed.2d 240 (1969); see *N.L.R.B. v. Borg-Warner Corp.*, 356 U.S. 342, 346–47, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

forcement of these [fringe benefit] programs and to aid the Association's costs in time and effort in establishing and maintaining all the records provided for in this Agreement.

Under the Union's view this provision is a mandatory subject since it relates to the administration of a contractual fringe benefit program. Provisions which require contributions into pension and similar fringe benefit plans are mandatory subjects of bargaining. *Inland Steel Co. v. N.L.R.B.*, 170 F.2d 247, 251 (7th Cir. 1948), *cert. denied on the pension issue*, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949), *aff'd on other grounds sub nom. American Communications Association v. Douds*, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950). However, the provision in the present case did not relate to employer contributions into a fringe benefit plan and did not directly contemplate that the fund would be applied to providing financial assistance to employees. It clearly attempts to regulate a matter not within the employer-employee relationship. The provision is concerned solely with supplying management with sufficient funds to compensate the administrator of the pension and welfare funds, as well as to defray other incidental expenses of the employers. The Union has little concern with the financing arrangement adopted by management to pay these expenses. It is true that management's failure to meet these expenses might have a potentially detrimental effect on the employees. However, a provision which has such a remote, indirect and incidental impact upon a condition of employment is not a mandatory subject of bargaining. *Seattle First National Bank v. N.L.R.B.*, 444 F.2d 30, 32–33 (9th Cir. 1971). The contributions into the Laborers Administrative Expense Account related only to the internal procedures of the employers and their representative, Builders Association of Kansas City, and was not a mandatory subject of bargaining. It does not have such a direct relationship with the terms and conditions of employment as to fall within the category of a mandatory subject of bargaining.

It does not *"materially* or *significantly* affect the terms or conditions of employment." *Seattle First National Bank v. N.L.R.B., supra* at 33 (emphasis in original); *cf. N.L.R.B. v. Borg-Warner Corp., supra.*

The two cent per hour contribution into the Laborers Industry Advancement Fund was to be used for the following purposes:

This fund is created in general to train and improve the efficiency of workmen and to improve general conditions and relationships of the construction industry as a whole, which shall include, but not be limited to industrial relations, public relations, labor relations, safety and any other function which is designed to advance and promote the interests of the building industry generally.

This provision explicitly provides that funds may be expended for the promotion and betterment of the general construction industry. Industry promotion funds do not encompass any aspect of the employer-employee relationship and are not mandatory subjects of bargaining. *N.L.R.B. v. Detroit Resilient Floor Decorators Local 2265*, 317 F.2d 269, 270 (6th Cir. 1963); *Local 80, Sheet Metal Workers*, 161 N.L.R.B. 229, 233 (1966). The Board properly concluded that contributions into the Laborers Industry Advancement Fund were nonmandatory subjects.

The provision which required the deposit of $1,000, later reduced to $500, to guarantee the payment of wages and fringe benefit contributions has been properly characterized by the Board as a performance bond. The Board has consistently held that performance bonds are not mandatory subjects since the "statutory obligation to bargain is not limited and cannot be limited to financially responsible parties, whether employer or labor union." *Carpenters' District Council (Excello Dry Wall Co.)*, 145 N.L.R.B. 663, 664 (1963). This approach has been uniformly adopted by the courts. *N.L.R.B. v. International Hod Carriers Local 1082*, 384 F.2d 55, 56–57

(9th Cir. 1967), *cert. denied*, 390 U.S. 920, 88 S.Ct. 853, 19 L.Ed.2d 980 (1968); *N.L.R.B. v. American Compress Warehouse Division*, 350 F.2d 365, 369–70 (5th Cir. 1965), *cert. denied*, 382 U.S. 982, 86 S.Ct. 558, 15 L.Ed.2d 472 (1966). These decisions are controlling; the performance bond provision was a nonmandatory bargaining subject.

■ Our review of the record as a whole convinces us that there is substantial evidence to support the Board's finding of a § 8(b)(3) violation. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 29 U.S.C. § 160(e). We recognize that the Board possesses special expertise in areas relating to the mechanics of collective bargaining, particularly in defining mandatory and nonmandatory subjects of bargaining. *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 685–86, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Under the circumstances of this case, we defer to that expertise.

■ The Union's final contention[9] is that there is insufficient evidence to support the Board's finding of a § 8(b)(1)(B) violation. Section 8(b)(1)(B), 29 U.S.C. § 158(b)(1)(B), proscribes all union activities which restrain an employer in selecting a collective bargaining representative. The Board found that the Company had objected to its participation in the Laborers Industry Advancement Fund which was administered by the Builders Association of Kansas City. The Board concluded that the Union's insistence on the Company's participation in this fund was an attempt to impose a bargaining representative on the Company and thus violated § 8(b)(1)(B). There is substantial evidence in the record to support this finding. *Metropolitan Dis-*

---

9. The Union has also contended that since the subcontracting clause in the collective bargaining agreement was valid under the construction industry proviso to § 8(e), 29 U.S.C. § 158(e), the Union could use economic sanctions and bargain to impasse to force subcontractors to accept all provisions in the agreement. This matter is not discussed in the opinion of the Administrative Law Judge or the Board's decision and order. The Board's

---

*trict Council (McCloskey and Co.)*, 137 N.L.R.B. 1583 (1962).

On the basis of the foregoing we enforce the Board's order which found that the Union had violated § 8(b)(1)(B) and § 8(b)(3) of the NLRA.

Order enforced.

---

assertion that this matter was not presented in the proceedings before the Board has not been refuted by the Union. Accordingly, we will refuse to discuss this issue which has been raised for the first time on appeal. *N.L.R.B. v. International Hod Carriers Local 1140*, 285 F.2d 397, 402 (8th Cir. 1960), *cert. denied*, 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203 (1961); 29 U.S.C. § 160(e).